Cheshire,
No. 5286.

WARREN L. MURRAY, *Ex'r v.* SARAH T. PEABODY *& a.*

Argued March 2, 1965
Decided June 30, 1965.

*Cleveland, Waters & Bass* and *John F. Johnston,* 2nd (of New York) (*Mr. Robert P. Bass, Jr.* orally), for the executor.

*Faulkner, Plaut, Hanna & Zimmerman* (*Mr. N. Michael Plaut* orally), for the defendant Sarah T. Peabody.

*Booth, Wadleigh, Langdell, Starr & Peters* (*Mr. Winthrop Wadleigh* orally), for the defendant Sarah C. Morris.

*Wescott & Millham* (*Mr. Harold E. Wescott* orally), guardian ad litem, for the minors Susan Morris and William H. Peabody.

BLANDIN, J. The ultimate questions presented by this case are as follows:

1. What if anything does the estate owe Sarah T. Peabody under the antenuptial agreement dated September 15, 1954?

2. To what is Sarah Morris entitled under the terms of the agreement of September 30, 1953 and article III of the will of William H. Peabody?

3. May the executor distribute to Sarah Morris the jewelry and articles of personal adornment received by William H. Peabody from the estate of Sara Y. Peabody, to the extent that they can be identified, in accordance with article II of the will?

In addition to these, there is the further issue of whether the Trial Court abused his discretion in refusing to allow counsel fees to the attorneys for Sarah T. Peabody.

It appears that a discussion first of the claims of Sarah Morris referred to in the second and third questions above, together with a statement of the undisputed relevant facts, will assist in clarifying this situation.

I. The decedent, William Peabody, was married twice. His first wife, Sara Y. Peabody, died testate August 19, 1953. On September 16, 1954, he married the defendant Sarah T. Peabody, who survived him. The defendant Sarah Morris is a granddaughter of Sara Y. and William. Sara Y. Peabody's will, so far as pertinent, provided as follows:

"2nd. I hereby give, devise and bequeath all of the rest, residue and remainder of my estate, both real and personal and wherever situate, to my husband, WILLIAM H. PEABODY, for him to have and to hold the same during his lifetime.

"3rd. I give, devise and bequeath to my son WILLIAM H. PEABODY, JR. . . . fifteen percent (15%) of my net estate, whether real or personal, and wherever situate, on the death of my husband, WILLIAM H. PEABODY, or in case he shall have predeceased me the same shall be WILLIAM H. PEABODY, Jr,'s upon my death, for him to have and to hold the same to his own use and behoof forever.

"4th. Upon the death of my said husband . . . after the payment to my said son, as outlined above, then do I give, devise and bequeath all of the remainder and residue of my estate, both real and personal, and wherever situate, to the CITY BANK FARMER'S TRUST COMPANY, New York City, to be managed by their Custodian Account . . . in trust, hereby directing one-half (1/2) of the income therefrom to be paid to

my granddaughter, SARAH CATHERINE PEABODY [the defendant Sarah Morris, daughter of William H. Peabody, Jr. and Dorothy M. Peabody] until the death or remarriage of her mother, DOROTHY M. PEABODY, in which event the same shall become hers absolutely and for her, the said SARAH CATHERINE PEABODY, to have and to hold the same to her own use and behoof forever."

The remaining one half of the income, together with the residue of the estate was bequeathed to the defendant Sarah Morris, the prior interest of Dorothy M. Peabody having terminated upon her remarriage. There followed a final provision, being the 7th clause, which read as follows:

"I order that my Trustees may retain any and all securities which may come into their hands as part of my estate, regardless of whether the same be legal investments for trustees under the laws of the State of New Jersey or any other jurisdiction, without charge or liability to them; and also that they may invest and reinvest in securities which in their judgment are sound and reliable . . . ."

The assets of this estate consisted of personal property only, the real estate being in joint tenancy with William.

The inventory disclosed: Miscellaneous articles $2,390; cash and bank accounts $798.74; and stocks and bonds $87,318, of which $87,120 was Weyerhaeuser stock. After the death of Sara· Y. Peabody August 19, 1953 the Weyerhaeuser Company on December 10, 1953 distributed to its stockholders one share of Fiber Products, Inc. for each ten shares of Weyerhaeuser Company. As a result, Sara's net estate was increased by 144 shares of Fiber Products, Inc. which on November 30, 1955, was merged into Wood Conversion Company on a share for share basis. According to the final account allowed January 7, 1955, William H. Peabody contributed $6,804.44 to enable the estate to pay the bills and expenses without resorting to the sale of any of the stock.

On September 30, 1953, approximately five weeks after Sara Y. Peabody's death, an agreement was executed by William H. Peabody as first party and William H. Peabody, Jr., Sarah Catherine Peabody (now Morris) and Dorothy M. Peabody (who, as previously stated, now has no interest in the dispute), as second parties, as follows:

"The purpose of this agreement is to disencumber the property owned by SARA Y. PEABODY, late of Westmoreland, New

Hampshire, of any trust that may have been created by said Will and to transfer to the first party all of the net assets of said SARA Y. PEABODY, as shown in the inventory of her estate on file in the Cheshire County, New Hampshire, Probate Court, free from the terms and conditions of the Will of SARA Y. PEABODY; the further purpose of this contract is to provide that the legatees under the Will of SARA Y. PEABODY shall benefit to the same extent that they would benefit had this contract not been executed.

"NOW, THEREFORE, in consideration of the mutual agreements herein contained, and other good and valuable consideration, receipt of which is hereby acknowledged, the second parties, and each of them, do hereby convey, set over and assign all the legal and/or beneficial (equitable) interests which they obtained, or may hereafter obtain, under the Will of SARA Y. PEABODY to the first party, so that the first party will own the complete title to all property now held by the Executors of the Will of SARA Y. PEABODY, subject to the amounts to be expended for the just debts, funeral expenses, taxes and expenses of administration of said estate, as well as gift taxes, if any, which may be due from the second parties as a result of this conveyance. The second parties further agree that they will execute such papers as may be required, both now and in the future, to carry into effect the purposes of this contract.

"The first party agrees, in consideration of the agreements herein contained and in consideration of the execution of the above-mentioned papers by the second parties that he will prepare and execute a Will in which he will leave to each of the above-named parties a share equivalent to that to which he and she would be entitled under the Will of SARA Y. PEABODY had this agreement not been executed. The first party agrees that he will not revoke that part of said Will affecting the property transferred to him as above provided."

William H. Peabody on the date of Sara's death owned in his own right 1,090 shares of Weyerhaeuser stock, and under the terms of the above agreement he acquired an additional 1,440 shares from Sara's estate, making his total holdings 2,530 shares. In 1956 Weyerhaeuser stock was split four for one, so that on October 1, 1956, William owned 10,120 shares. Later in 1956 William had the new certificate for 7,590 shares received in the split divided into three certificates, one for 1,150 shares, another for 5,760 shares, and the last for 680 shares. The

certificate for 1,150 shares was transferred and delivered to his second wife, Sarah T. Peabody, on April 8, 1957; the remaining certificates remained intact and in his possession until he died on October 8, 1962.

He performed his part of the agreement of September 30, 1953, by executing a will on January 27, 1962, which contained the following clauses:

"Second: I give and bequeath to my granddaughter, SARAH CATHERINE PEABODY MORRIS, if she shall survive me, all jewelry and articles of personal adornment received by me from the estate of my former wife, SARA Y. PEABODY, and of which I may be possessed at the time of my death. All other jewelry and articles of personal adornment of which I may be possessed at the time of my death I give and bequeath to my son, WILLIAM H. PEABODY, JR., if he shall survive me.

"Third: I order and direct my Executor, hereinafter named, to carry out the provisions of a certain agreement dated September 30, 1953, between myself on the one part and WILLIAM H. PEABODY, JR., SARAH CATHERINE PEA-BODY MORRIS, and DOROTHY M. PEABODY, on the second part, which agreement was entered into by us in the settlement of the estate of my former wife, SARA Y. PEA-BODY . . . .

"Seventh: I direct that my Executor and Trustee shall have, with respect to any and all property at any time held by it hereunder, the following powers . . . .

"(b) To sell any such property, whether real or personal, at either public or private sale, for cash or on credit; to exchange any such property; and to grant options for the purchase thereof."

At the date of William Peabody's death (on October 8, 1962), Weyerhaeuser stock was valued at $22.87 per share. On January 8, 1963, the executor procured a license from the probate court to sell the securities held in the estate, and on March 4, 1963, he sold 8,570 shares of the Weyerhaeuser stock for prices ranging between $27.00 and $27.50 per share. This left 400 shares of Weyerhaeuser stock in the estate's portfolio. Sarah Morris first made known her contention that she was entitled to the stock in specie at a meeting of the parties at the offices of counsel for the plaintiff on September 6, 1963. When William died on October 8, 1962, the 5,760 shares of Weyer-haeuser stock claimed by Mrs. Morris had a value of $131,760;

at the time of the hearing in February of 1964, they were worth $190,800; and on December 9, 1964, the value was $250,560. In addition, there have been dividends declared by Weyerhaeuser since October 8, 1962, which it would appear have exceeded $10,000 on 5,760 shares.

The Trial Court found that the intent of the parties to the agreement of September 30, 1953, between the decedent William H. Peabody, the defendants Sarah C. Morris and William H. Peabody, Jr. (he being not a party to the present proceedings), was to give the decedent full title to Sara's net estate, free of any trust or other restraints under Sara's name. By the terms of the agreement, the decedent undertook to pay Sara's debts and expenses of administration, including any gift taxes. The second part of the instrument states specifically that its purpose was to "disencumber the property owned by Sara . . . of any trust" and to transfer to the decedent all the net assets of Sara's estate "free from the terms and conditions of the will of Sara Y. Peabody."

The language of this agreement is so plain that we believe we need not labor the point that the Trial Court's findings were correct. While it is axiomatic that the interpretation of all written instruments is for this court (*Sylvester* v. *Newhall*, 97 N. H. 267), we see no error in the result reached by the Trial Court. *Hogan* v. *Lebel*, 95 N. H. 95; *Aldrich* v. *Beauregard & Sons*, 105 N. H. 330, 336. Since this is so, the defendant Sarah Morris derives her rights from William H. Peabody's will and the agreement of September 30, 1953. In the agreement of September 30, he agreed to leave to each party, including this defendant, "a share equivalent to that to which he and she would be entitled under the will of Sara Y. Peabody had this agreement not been executed." A further purpose of the will was "to provide that the legatees under the will of Sara Y. Peabody shall benefit to the same extent that they would benefit had this contract not been executed." It is significant that by the terms of the agreement, Mrs. Morris was to take under a will not then in existence, but to be executed in the future. The parties could have made a different arrangement so that she could have claimed as a creditor of William's estate; however, she chose rather to take as a legatee under his will.

Nevertheless she argues that the September 30 agreement entitles her to receive in specie what she would have received under Sara's will had the agreement not been executed. Under

the agreement, she says she is entitled to 85 per cent of the Weyerhaeuser and Wood Conversion Company stock in specie, as of October 8, 1962, the date of Mr. Peabody's death. Also, she demands 85 per cent in value of the jewelry which Sara owned at her death and which was still on hand at the decease of William H. Peabody and all the dividends paid on 85 per cent of the Weyerhaeuser and Wood stocks since Mr. Peabody's death.

Basically, this defendant's argument rests upon the premise (1) that under Sara's will she was entitled to stock and jewelry in specie and (2) that this condition was not altered by the September 30 agreement. The Trial Court rejected these contentions and ruled that Mrs. Morris was not entitled to the stock or jewelry in specie, but rather to 85 per cent of the value of the assets traceable to Sara's estate as of the date of William's death, that is 85 per cent of the Weyerhaeuser and Wood stocks, and 85 per cent of Sara's jewelry. In addition to this, the Trial Court awarded her all the jewelry and articles of personal adornment received by William, the decedent, from the estate of his wife Sara and of which he was possessed at the time of his death, in accordance with the second clause of William's will.

We do not believe that the defendant's position is tenable. The bequest in Sara's will to the trustee for the benefit of Sarah Morris was of the residue of her estate, which consisted of 85% of the entire estate. There was no mention made of Weyerhaeuser or any other specific stocks. It is customary for executors and administrators to sell stocks not specifically bequeathed to satisfy debts and other liabilities and to distribute the balance. In this case, in view of the limited value of Sara's assets, except for the Weyerhaeuser stock, it must have been known to her that some of this stock would have to be sold. This procedure has legislative recognition and approval. RSA 554:8. It avoids the risk of decrease in value in stock and the possibility of the personal liability of executors or administrators and accelerates the settlement and distribution of estates. Furthermore, Sara, as indicating that she did not intend a gift in specie, in the seventh clause of her will, directed that her trustees "may retain" the stocks and securities and also that they "may invest and reinvest in securities which . . . are sound and reliable."

Again, the circumstances surrounding the September 30 agreement and the practical construction given to it by the

parties furnishes substantial evidence that the defendant Sarah Morris' claim is unsound. *Bogosian* v. *Fine*, 99 N. H. 340; *Hoyt* v. *Horst*, 105 N. H. 380, 385. The September 30 agreement was executed only nineteen days after the probate of Sara's will. The parties may be presumed to have realized that at least some of Sara's stocks would have to be sold to satisfy the obligations of the estate, and this would have been so had not the decedent William advanced nearly $7,000 of his own money to satisfy these obligations. In the September 30 agreement, the parties made no mention of specific stock, but rather stipulated that William should leave Mrs. Morris and the other contestant "a share equivalent" to that which they would have been entitled under Sara's will. The word "equivalent" implies something equal to the value of the stock, not necessarily the stock itself. 30 C. J. S., Equivalent, 1131; *Knox* v. *O'Brien*, 7 N. J. Super. 608; Bouvier's Law Dictionary, Equivalent, *p.* 361. Had the parties intended to contract for delivery of stock in specie, it may be assumed that they would have said so, instead of expressing their design in general terms as they did.

William's will gave the trustees power to sell "any and all property" in his estate. Neither the Weyerhaeuser or any other stock was excepted from this provision. He also ignored the 85 per cent and the 15 per cent division clause relating to jewelry, as provided for in Sara's will. Had he felt obligated to leave the assets received from her estate in specie, it is believed he would have done so. The fact that he kept the Weyerhaeuser stock appears to have been, as the defendant Sarah T. Peabody testified, because he had devoted practically his lifetime to the company, took great interest in his association with it, and wished to vote the stock, receive the dividends and retain his connection with Weyerhaeuser as long as he lived.

In addition to these facts, as bearing on Mrs. Morris' own understanding of the agreement, there was no suggestion by her that she was entitled to stock in specie until eleven months after Mr. Peabody's death, when the securities had gained tremendously in value. Also, her claim came over six months after the bulk of the stock had been sold under license from the probate court. This practical construction of the September 30 agreement between the parties is persuasive evidence that they did not intend that William bequeath the stock in specie. *Bogosian* v. *Fine*, 99 N. H. 340; *Hoyt* v. *Horst*,

105 N. H. 380, 385. The original bequest in Sara's will was of the residue of her estate and general in its terms. The circumstances indicate that it was her design to make the legacy general and that William so interpreted it.

In summary, we hold that the wills of Sara and William and the agreement of September 30, interpreted in the light of the surrounding circumstances, lead to the conclusion reached by the Trial Court and that the defendant Mrs. Sarah Morris is not entitled to the Weyerhaeuser stock in specie, but rather to 85 per cent of the value of it and the Wood stock as of the date of Mr. Peabody's death. Her exceptions are therefore overruled.

II. In view of what we have already decided, we hold that the Trial Court was correct in ruling that all the jewelry and articles of personal adornment received from Sara's estate go to Mrs. Morris. We further hold that his finding that the gift in the second clause in this will to Mrs. Morris was in addition to William's obligation under the agreement of September 30 is sustainable. We accordingly construe the will, together with the September 30 agreement, as did the Trial Court, and hold that Mrs. Morris is entitled to all the jewelry and other personal articles under the second clause of Mr. Peabody's will. In addition she is entitled to 85 per cent of the value of all assets traceable to the estate of Sara Y. Peabody.

III. The claim of the defendant Sarah T. Peabody, William's second wife, stems from an antenuptial agreement made between them on September 15, 1954, the day before they were married. The key provision, about which the dispute centers, reads as follows: "The Second Party (William H. Peabody) agrees that if the parties are married, he will transfer or cause to be transferred to the First Party (Sarah Keniston Clark) or to her personal representative on or before January 3, 1956, in cash and/or kind at his election, property of the fair market value of Fifty Thousand Dollars ($50,000.00); the fair market value of any property transferred hereunder to be determined as of the date of transfer." The defendant Mrs. Peabody asserts that her husband did not pay her any part of the $50,000 due her before his death on October 8, 1962. The validity of her claim hinges upon an interpretation of a transaction between the two on April 8, 1957.

The record discloses that on August 27, 1956, Mr. Peabody had issued to himself a certificate for 1150 shares of Weyer-

haeuser stock, then worth $50,025. On April 8, 1957, the two went to the savings bank in Walpole where each had a safe deposit box to which the other did not have access. On that date, the 1150 shares of Weyerhaeuser had declined in value and were worth $39,818.75. Mr. Peabody took from his box the certificate for 1150 shares and asked a bank official for an assignment form. Mrs. Peabody filled this out for him, as it was customary for her to do in such matters. He then signed it and gave her both the assignment and the stock certificate. She testified that there was no conversation between them at that time about her having possession of the assignment and the certificate. Immediately afterwards they went together to a private room in the bank. He asked her to put the certificate and assignment in her safety deposit box, to which he had no access, and "at that time" he requested her not to send the assignment to the company for registration of the stock in her name. She said she knew that the reason was because he wished to be able to vote the stock and receive the dividends and that "He probably told me beforehand or afterwards." She went on to testify that she knew the underlying reason he wished to retain the stock was because "the Weyerhaeuser Company was one of the vital interests in his life, and I think he wanted to have a part in the business . . . . He was vice president, but he was also vice president of several of their subsidiaries" upon his retirement. She also testified they both assumed that the stock was delivered to her in partial payment of the $50,000 due her under the antenuptial agreement.

Mrs. Peabody continued to keep the certificate and the assignment in her deposit box until after he died on October 8, 1962. She testified unequivocally that she knew she did not have to do so and that she could have had the transfer made to her on the books of the company at any time that she so desired and collected the dividends. In deference to his wishes, she chose not to do so or to ask for the dividends. The spouses were living together amicably during this period, and in view of the entire situation, we see no reason to upset the Trial Court's finding that Mrs. Peabody became possessed of full title to the property, but voluntarily gave up her voting rights and the dividends to her husband.

There was no talk of any capital gains problems before April 8, 1957, and no evidence that Mr. Peabody was in any

way concerned about this until after that date. Furthermore, no evidence was presented to the Court upon which he could assume, except by speculation, that there might have been a capital gains tax. At the time of the April 8 transaction, transfer of title was governed by RSA 294:56, now RSA 382-A:8-309. Delivery of the stock certificate, and the assignment in the circumstances here, abundantly satisfy the requirements of section 56, *supra*. See *Howison* v. *Bank*, 88 N. H. 31. In this state of the record, we believe the Trial Court's conclusion that the parties intended the delivery of the certificate and assignment by Mr. Peabody to Mrs. Peabody on April 8, 1957, as an outright transfer of title and possession of the stock to her, is unassailable. Indisputably, if found to be a transfer of title, it was in partial payment of his obligation to her under their antenuptial agreement.

IV. The final issue to be resolved as to whether the Court abused his discretion in refusing to allow counsel fees for Sarah Peabody's attorneys does not require extended consideration. She entered upon the contest primarily for her own benefit and not for that of either the estate or the court. *Cf. Concord Nat. Bank* v. *Haverhill*, 101 N. H. 416. When she approached the lawyer for the executor, she was advised by him that she should procure independent counsel. This advice was entirely proper and consistent with the attorney's duty not to represent what might prove to be conflicting interests. It in no way obligated the estate to pay her counsel fees. The allowance of such in this jurisdiction has always been approached in a gingerly fashion. Whether they should be allowed on a "reasonably mean" basis or not at all rests "in the cautiously exercised discretion of the court." *Concord Nat. Bank* v. *Haverhill*, 101 N. H. *supra*, 419; see *Lavoie* v. *Bourque*, 103 N. H. 372, 375. We have no statute which compels allowance of counsel fees here, and on its facts the case falls within no exception to the general rule which denies them. See *Guay* v. *Association*, 87 N. H. 216, 221-222.

In summary, it appears to us that the findings, rulings and decree of the Trial Court are sustainable and that division of the estate should be made in accordance with them.

The order is

*Defendants' exceptions overruled; remanded.*

All concurred.