Hillsborough
No. 78-166

## ERIN FOOD SERVICES, INC.

v.

## 688 PROPERTIES

April 13, 1979

*Kfoury & Williams*, of Manchester (*Joseph Williams* orally), for the plaintiff.

*O'Neill, Backus & Spielman*, of Manchester (*Robert A. Backus* orally), for the defendant.

LAMPRON, C.J.   This case is an action for specific performance. The plaintiff, Erin Food Services, alleges that according to a build-and-lease agreement it was entitled to exercise an option to purchase property owned by the defendant, 688 Properties, at 688 South Willow Street in Manchester. The defendant maintains that the plaintiff did not validly exercise its option to purchase, thus defendant was never obligated to convey. The matter was heard before a Master (*Charles T. Gallagher*, Esq.), who recommended that defendant be directed to convey the property. The master's report was accepted by the Court, *Flynn*, J. The defendant filed a motion for reconsideration, which was denied in a supplemental report by the master. The supplemental report was also accepted by the Trial Court, *Mullavey*, J. The defendant seasonably excepted to the reports, and all questions of law were reserved and transferred by *Flynn*, J.

Since 1971, the parties have been involved in the financing, construction, and operation of Burger King Restaurants in New Hampshire. Their relationship revolved around a number of build-and-lease agreements. The plaintiff, a franchisee for Burger King Restaurants, would find a suitable site, and the defendant would then buy the property and finance the building of the restaurant. After construction, the defendant would lease the premises to the plaintiff, who would run the daily operations. A build-and-lease agreement for the Burger King located at South Willow Street was entered into in March of 1971. This agreement was replaced by a similar agreement in 1973.

The defendant received a return on its investment in two ways. First, the plaintiff was required to pay rent to the defendant. The rental fee was based on a set percentage of the defendant's investment cost. The second was through plaintiff's option to purchase. Specifically, the agreement provided that plaintiff could purchase the property outright if it paid a five percent uncompounded appreciation factor in addition to the actual cost of the investment. Under the terms of the original 1971 agreement, plaintiff could not exercise the option to purchase until 1979.

In 1973, the defendant purchased additional property for an enlargement of the parking area for the South Willow Street Burger King. Because of the additional property in the leasehold, the 1971 agreement was replaced. The terms of the 1973 agreement were essentially identical to those in the 1971 agreement, except that the description of the leasehold property was updated, and the option period was reduced from the original eight years to three years.

In April 1974, the parties entered into a supplemental agreement. The terms were that plaintiff could not exercise its option to purchase "within five years from the commencement date of this lease," unless it offered the defendant both an "available site" on which a contractor was prepared to enter an agreement to build a substitute restaurant and a franchisee ready to enter into a lease similar to that existing between the parties. In October 1976, plaintiff attempted to exercise its option to purchase the South Willow Street property. A purchase price of $497,796.96, which included the five percent appreciation factor from 1971 to October 1976, was tendered. Plaintiff, however, did not offer the defendant an "available site." That omission was based on its belief that the agreed five-year period was to run from the 1971 lease, the beginning of the original leasehold arrangement. After a hearing, the master found that when the supplemental agreement was entered into, there was only one lease, the 1973 lease, and thus it was the 1973 lease from which the five-year period was to run, not the 1971 lease. The master concluded that Erin's Food Service's failure to offer an "available site" rendered its purported exercise of the option invalid. The master's decision was not appealed.

In January 1977, Erin again tried to exercise its option to purchase. This time it offered the defendant an available site in Barrington, Illinois. The plaintiff tendered a purchase price of only $481,253.50. This was $16,516.46 less than the amount previously offered in October 1976. Erin did not offer to pay appreciation on the property between August 1971 and August 1973 because it alleged that the 1971 agreement was superseded by the 1973 agreement.

The defendant refused to convey on two grounds: first, it claimed that Barrington, Illinois, was not an "available site" as contemplated by the parties; and second, it claimed the purchase price should have included appreciation commencing from 1971. After a hearing, the master ruled against the defendant. He found that Barrington, Illinois, was an available site and that the correct price was $481,253.50. In addition, he ruled that all rental payments from March 1977, the day the property should have been conveyed, until the day defendant actually conveyed, had to be deducted from the final purchase price. The defendant challenges all of the master's findings.

## THE AVAILABLE SITE

■■ A condition precedent to plaintiff's exercise of the option to purchase the property was set forth in article 2 of the supplemental agreement of 1974. Erin had to offer "an available site on which a reputable contractor is prepared . . . to enter into a fixed price construction contract to build a Burger King restaurant and on which a Burger King franchisee is prepared . . . to enter a net lease agreement." The controversy concerns interpretation of the words "an available site." Interpretation of contracts is the process of determining from the language and conduct of the parties what they are required to do to conform to the terms of the agreement. 3 A. CORBIN, CONTRACTS § 532 (1960); 4 S. WILLISTON, LAW OF CONTRACTS § 600 (3d ed. W. Jaeger 1961). "[T]he proper interpretation of a contract is that which will make it speak the intention of the parties at the time it was made." *Ass'n of Portsmouth Teachers v. Portsmouth School Dist.*, 113 N.H. 659, 661 312 A.2d 573, 575 (1973) *quoting Peter Salvucci & Sons, Inc. v. State*, 110 N.H. 136, 144, 268 A.2d 899, 905 (1970).

■ The parties chose an ambiguous word to define their contractual relationship; "available" is a term susceptible to a variety of possible meanings. To interpret this word a court must supplement its general understanding of the term with evidence of surrounding circumstances. *Rogers v. Cardinal Realty Inc.*, 115 N.H. 285, 286, 339 A.2d 23, 25 (1975). As a general rule the interpretation of a written instrument is an issue of law for this court to determine. *See Murray v. Peabody*, 106 N.H. 319, 324, 211 A.2d 855, 859 (1965). Where, however, the trial court allows the admission of extrinsic evidence, the question of its meaning should be left to the trier of facts unless the meaning of the extrinsic evidence is so clear that reasonable men could only reach one conclusion. J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS § 9–312, at 124 (2d ed. 1977); 4 S. WILLISTON, LAW OF CONTRACTS § 616, at 652 (3d ed. W. Jaeger 1961); RESTATEMENT (SECOND) OF CONTRACTS § 238(2) (Tent. Draft. No. 1-7 1973). Both parties introduced

extrinsic evidence to clarify the ambiguous term. Thus, we must determine whether the master's interpretation is supported by the evidence.

■ The master found that "available site"-was not narrowly defined in the contract, and that Barrington, Illinois, complied with the terms of the contract. There was evidence that defendant invested in these restaurants to obtain tax shelters. Thus, it was reasonable to infer that the parties did not intend the available site requirement to have territorial limits. These could easily have been specified, if intended. The master's interpretation, therefore, was reasonable and could be properly drawn from the evidence. *Dove v. Knox Mt. Corp.*, 114 N.H. 278, 280, 319 A.2d 640, 641 (1974).

THE PURCHASE PRICE

The terms for the price of the property were the same in both the 1971 and 1973 build-and-lease agreement. The specific provision, article 23b, reads:

> In the event of the exercise of said option, the purchase price for the premises . . . shall be the sum of: Lessor's cost of acquisition of the land herein described, site improvements, and building construction, increased at the rate of five percent (5%) per annum of such cost (but not compounded) for each year or pro-rated for a portion thereof from the commencement of the term of *this lease* to the date of exercise of said option. (Emphasis added.)

Article 31 of the 1973 lease provides: "*This lease* shall supersede a lease between the parties dated March 25, 1971, and that lease shall have no further validity." (Emphasis added.) The master ruled that the plain meaning of these two provisions is that the purchase price should be computed from the 1973 lease, not the 1971 lease. In other words, under the master's interpretation, defendant receives no appreciation on its investment from 1971 to 1973.

The defendant argues that the writing as it has been interpreted does not conform to the actual agreement of the parties and must therefore be reformed. Specifically, it alleges that the inclusion of "this lease" in the 1973 agreement was a scrivener's error, and that the parties really intended the appreciation to run from 1971 until the exercise of the option. The master found and ruled to the contrary.

■ "The law is well settled in this jurisdiction that reformation may be granted in a proper case where the instrument 'fails to express the intention which the parties had in making the contract. . . .' "

*Gagnon v. Pronovost,* 97 N.H. 58, 60, 80 A.2d 381, 383 (1951), *quoting Minot v. Tilton,* 64 N.H. 371, 374, 10 A. 682, 684 (1887). It is equally well settled that reformation will only be granted when the evidence is *clear* and *convincing* that (1) there was an actual agreement between the parties, (2) there was an agreement to put the agreement in writing and (3) there is a variance between the prior agreement and the writing. J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS § 9-31, at 313 (2d ed. 1977); *see* 3 A. CORBIN, CONTRACTS §§ 614–16 (1960); 13 S. WILLISTON, LAW OF CONTRACTS §§ 1547–49 (3d ed. W. Jaeger 1970).

█  This court will uphold a master's findings and rulings when the record discloses sufficient evidence to support them. *Ecko Enterprises, Inc. v. Remi Fortin Constr., Inc.,* 118 N.H. 37, 41, 382 A.2d 368, 371 (1978). We hold, however, that the record in this case does not warrant a finding that the parties intended that 688 Properties was to forego a full return of its investment. The evidence unequivocally demonstrates that both parties at the time of execution of the 1973 lease agreed that 688 Properties was to receive a return on its investment from 1971 until the date of sale. Indeed, Mr. Murray of Erin Food Services, on cross-examination admitted this fact.

Q.  Now isn't it in fact true, sir, that at the time the 1973 lease was executed you never had, at any time, at least prior to the court's ruling in a supplementary report you

never at any time thought that the partnership [688 Properties] was not entitled to appreciation from August 1971.

A.  Correct.

The most compelling evidence of the existence of an agreement that appreciation would accrue from 1971 until the date of sale, can be seen from Mr. Murray's own conduct. In October 1976, Erin Food Services attempted to exercise the purchase option and tendered $497,796.96. This figure included appreciation from the date the leasehold had started, in 1971, to the date of exercise. Moreover, even the master found that the 1973 lease was simply a replacement of the 1971 lease, and was entered into to reflect the new investments made by 688 Properties.

The plaintiff argues that irrespective of such evidence, defendant's own conduct should foreclose the possibility of reformation. Specifically, plaintiff asserts that defendant earlier obtained a court interpretation of the provision that is now in controversy. In that action, which was initiated by 688 Properties, the master interpreted the provisions of the 1974 supplemental agreement to require that the

238

five-year period in which Erin had to offer 688 Properties an available site commenced from the 1973 lease rather than the 1971 lease. Because of this interpretation, the plaintiff argues that the defendant should not be allowed to revive the 1971 agreement, when it was previously successful at having it terminated. We disagree with Erin's characterization of the previous proceeding. At that proceeding the master interpreted only the 1974 supplemental agreement; he did not interpret the 1973 agreement, nor did he consider the possibility of whether a mistake existed in the 1973 agreement.

The evidence is clear and convincing that the parties agreed that 688 Properties was to receive a full return of its investment, that they agreed that terms were to be put in writing, and that the 1973 agreement as written is at variance with the parties' real agreement. The lease should therefore be reformed to indicate that 688 Properties is entitled to appreciation from the beginning of the leasehold until the actual date of sale. Accordingly, the purchase price tendered by Erin Food Services was incorrect and the defendant had no duty to convey. The trial court's decree of specific performance is vacated.

*Exceptions sustained in part and overruled in part.*

All concurred.