Cheshire
No. 79-471

EDWARD TROMBLY AND SALLY TROMBLY

v.

BLUE CROSS/BLUE SHIELD OF NEW HAMPSHIRE–
VERMONT

December 3, 1980

*H. Neil Berkson*, of Keene, by brief and orally, for the plaintiffs.

*Joseph Stewart,* of Concord, by brief and orally, for the defendant.

DOUGLAS, J. The issue in this case is whether the insurance contract between the parties excludes coverage for certain of the plaintiff's medical bills because she is eligible for Medicare. We hold that it does not.

The plaintiffs, Edward and Sally Trombly, have received medical insurance coverage under a group contract between Mr. Trombly's employer and the defendant, Blue Cross/Blue Shield of New Hampshire–Vermont, since 1966. The insurance company issued to each employee separate subscriber certificates for Blue Cross, Blue Shield, and Major Medical coverage containing a summary of the terms of the contract with the employer. The three certificates are issued by the insurance company in a single package, which includes other riders, endorsements and literature.

In 1974, as a result of a total and continuing disability caused by thrombophlebitis, Sally Trombly became eligible to receive Medicare, Part A, automatically and Medicare, Part B, upon payment of a monthly premium. She elected not to purchase Medicare, Part B, because a Blue Cross/Blue Shield employee advised her that it was inferior to her existing coverage. Blue Cross continued as a secondary carrier to Medicare without objection for three years until November 1977 when it notified Sally Trombly that her basic coverage would terminate on July 1, 1978. In taking that action, the insurance company relied on an *internal* document entitled Underwriting Regulation Number 76-2, dated February 23, 1976, which provided that Medicare "eligibles" must enroll in Medicare, Part B, or lose basic coverage. That document was neither included in the subscriber package nor referred to in the literature.

The Tromblys objected to the insurance company's action in March 1978 and filed a suit for declaratory judgment in the Cheshire County Superior Court. The case was heard by a Master (*Mayland H. Morse, Jr.,* Esq.), who issued a report recommending a verdict in favor of the defendant. That report was approved by *DiClerico,* J., and plaintiff's exceptions were reserved and transferred to this court by *Dunfey,* C.J.

 The insurance contract involved in this case is a group policy between the insurance company and the employer. *See* 19 G. COUCH, CYCLOPEDIA OF INSURANCE LAW § 82:1 (2d ed. 1968). As with any insurance contract, the coverage of the policy may be modified by rider or endorsement to reduce the rights of

employees that would arise on a *subsequent* loss. *Id.* § 82:31. Modification of the terms of the policy is governed by the rules applicable to contracts generally, 17 G. COUCH, CYCLOPEDIA OF INSURANCE LAW § 65:31 (2d ed. 1967), which means that modification must be by mutual agreement. 17 AM JUR. 2d *Contracts* § 458 (1964). In this case there is no evidence that Mr. Trombly's employer agreed to a reduction in coverage of the policy. Although the insurance company *never* changed the wording of its policies, in 1976 it changed its interpretation of the language when it issued regulation 76-2. It appears from the record that the insurance company sent out notices to all persons in the Tromblys' position notifying them that, as of a certain date, they would be required by the terms of regulation 76-2 to sign up for Medicare, Part B, because she was eligible. That unilateral action sought to change the coverage of the policy that had been in effect for a decade.

■ ■ Generally, a rider attached to a policy is considered part of the contract if it has been lawfully attached or adequately referred to in the policy. 1 G. COUCH, CYCLOPEDIA OF INSURANCE LAW § 4:24 (2d ed. 1959). In this case the insurance company has not proved that it met the statutory requirements of RSA 419:6, 420:6, and 420-A:6 (Supp. 1979) that insurers must obtain the approval of the commissioner of insurance for changes to policies. The evidence in the record does not satisfy the insurance company's burden of proving that fact. RSA 491:22-a (Supp. 1979). When a company employee was asked by the master whether the regulation had been approved by the insurance department, he responded equivocally that the department "*is made aware* of these changes." (Emphasis added.) Stipulated fact number 16 expressly states that the regulation is an "internal document." It appears from the record that the insurance company attempted in house to change its prior *interpretation* of the contract rather than modify the language and specifically get approval from the commissioner of insurance. Although such action may be expedient for the company, it is not consistent with the consumer's interest in understanding a particular policy. *See American Policyholders' Ins. Co. v. Smith,* 120 N.H. 202, 206, 412 A.2d 749, 751 (1980).

■ ■ The parties agree that prior to 1976 the contract was interpreted to provide full coverage to those in Mrs. Trombly's situation. Although the company asserts that it sent notices to its subscribers informing them that the interpretation had changed, that notice does not satisfy legal requirements. By statute, the

subscription certificate issued by the insurance company to the insured must contain a statement that the contract includes any endorsements and attached papers and that it constitutes the entire contract. RSA 419:5(4), 420:5(4), 420-A:7 IV (Supp. 1979). Because the internal regulation never became a rider, or "attached paper", it cannot be considered a part of the contract until the appropriate steps are taken pursuant to RSA 419:6, 420:6 and 420-A:6 (Supp. 1979).

■ Although the language of the three certificates is not identical, it is substantially the same. The Blue Cross certificate contains the following statements:

"ARTICLE VI—BENEFITS NOT PROVIDED

2. Hospitalization for:
(c) Treatment of injury or disease if Member is *entitled* to benefits under Workmen's Compensation laws or other federal, state or municipal laws or regulations (emphasis added).
. . .

ARTICLE X—NONDUPLICATION PROVISIONS

. . .
2. Definitions
(a) 'Valid Coverage' means hospital, surgical, medical or major medical benefits . . . provided under governmental programs, Workmen's Compensation insurance or any coverage required or provided by any other statute.
. . .
3. Effect on Benefits
. . .
(b) As to any Benefit Period with respect to which this provision is applicable, the benefits that would be payable under this Certificate (in the absence of this provision) for Allowable Expenses incurred as to such person during such Benefit Period shall be reduced to the extent necessary, so that the sum of such reduced benefits and all the benefits payable for such Allowable Expenses under all valid coverage shall not exceed the total of such Allowable Expenses."

In construing the policy, the court must consider the policy as a whole; both clauses must be read together. *See Interstate Fire &*

*Cas. Co. v. Lee Raceway, Inc.*, 113 N.H. 593, 596, 311 A.2d 307, 309 (1973).

The fact that the insurance company itself attempted to alter the coverage of the policy after several years *without* changing the actual wording is the best indication that the contract is ambiguous. "Entitled" is an ambiguous word. *See Hurtt v. United States*, 309 F.2d 404 (1962); *MacArthur v. Massachusetts Hospital Service, Inc.*, 343 Mass. 670, 180 N.E.2d 449 (1962). But there is even greater ambiguity created by the conflict between the exclusionary clause, Article VI, and the nonduplication clause, Article X. Assuming *arguendo* that Mrs. Trombly is "entitled" to Medicare benefits even without signing up for them, then the question remains as to which clause controls. If exclusionary Article VI controls, the insurance company can refuse to provide any hospitalization benefits because Mrs. Trombly is "entitled" to Medicare. If duplication Article X controls, the insurance company can refuse to provide hospitalization benefits *only to the extent* that such benefits are actually provided by Medicare so that Blue Cross coverage would not be duplicative. In other words, Blue Cross would be a secondary carrier to Medicare.

The difference between the interpretations is that if Mrs. Trombly is covered by Medicare alone she is entitled to 150 days of hospitalization during an initial benefit period and up to ninety days of hospitalization for each subsequent benefit period; a benefit period terminates when the claimant has been out of the hospital sixty consecutive days. By contrast, under Blue Cross Mrs. Trombly is entitled to 365 days of hospitalization, and she would be entitled to another 365-day period as soon as she was discharged. As secondary carrier, Blue Cross would make up the difference between the benefits actually provided by Medicare and the amount available through Blue Cross.

The insurance company itself has used both interpretations. From 1974 to 1977, Blue Cross acted as secondary carrier to Medicare and paid those amounts not previously paid by the government. In 1977, the company unilaterally attempted to implement the policy reinterpretation set forth in regulation 76-2 by notifying Mrs. Trombly that her Blue Cross coverage would terminate because she was eligible for Medicare. As we noted previously, that action was ineffective to modify the contract, but it did raise a question of the proper interpretation of its terms.

New Hampshire has not yet expressly adopted the clear majority rule that ambiguous terms in an insurance policy are to be construed against the insurer and in favor of the insured. *See*

*McCaffery v. St. Paul Fire Ins. Co.*, 108 N.H. 373, 375, 236 A.2d 490, 492 (1967). Rather, the rule in this State is that insurance contracts are to be interpreted "in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." *Aetna Insurance Co. v. State Motors*, 109 N.H. 120, 125, 244 A.2d 64, 67 (1968). The present New Hampshire rule creates no presumptions in favor of either party. It relies on the assumption that the reasonable insured both reads the policy and comes to some understanding of its terms. In view of the prolixity of the language found in many insurance policies, this assumption is unfounded.

That "men in general cannot read and understand . . . insurance documents" is as true today as it was when Justice Doe made that observation in 1873. *DeLancey v. Insurance Co.*, 52 N.H. 581, 590 (1873). The difficulties created by ambiguous policy language, conflicting provisions, and complex forms have been illustrated in recent cases before this court. *See Shea v. United Services Automobile Ass'n*, 120 N.H. 106, 411 A.2d 1118 (1980); *Storms v. U.S. Fidelity & Guar. Co.*, 118 N.H. 427, 388 A.2d 578 (1978).

■ In general, the rules governing the construction and interpretation of written contracts apply with equal force to insurance policies. *Johnson v. Casualty Co.*, 73 N.H. 259, 262, 60 A. 1009, 1010 (1905). Thus, in interpreting contracts, the fundamental inquiry centers on determining the intent of the parties at the time of agreement. *See Erin Food Services, Inc. v. 688 Properties*, 119 N.H. 232, 235, 401 A.2d 201, 203 (1979). Any determination of intent is generally made by this court. *See Murray v. Peabody*, 106 N.H. 319, 324, 211 A.2d 855, 859 (1965).

In cases where policy language is ambiguous or when separate clauses lend themselves to conflicting interpretations, the generally accepted rule of construction adhered to by the majority of jurisdictions is that ambiguous language is construed against the insurer. *See* 43 AM. JUR. 2d *Insurance* § 271, at 330 n.1 (1969) (citing thirty-two states); 1 G. COUCH, CYCLOPEDIA OF INSURANCE LAW § 15:73 n.13 (2d ed. 159) (citing forty-six states). The following statement of the rule by the Connecticut Supreme Court in a case involving the interpretation of various portions of a life insurance policy is typical:

> "If the terms of the policy are clear and unambiguous, then the 'language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning' (citation omitted). However,

'[w]hen the words of an insurance contract are, without violence, susceptible of two interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted' (citation omitted)."

*Simses v. North American Co. for Life & Health Ins.*, 175 Conn. 77, 84, 394 A.2d 710, 714 (1978). *See also* 4 S. WILLISTON, CONTRACTS § 621 (3d ed. 1961).

This rule reflects the fundamental principle of contract law that "doubtful language is to be construed most strongly against the party who used it in drafting the contract." COUCH, *supra* at § 15:77. This rule of strict construction has been applied across the board for all types of insurance contracts. *Id.* at § 15:74. One of the most frequently articulated rationales for the rule is based on the fact that it is the insurer who controls the language of the policy and, therefore, any resulting ambiguity should be resolved in favor of the insured. *Id.* at § 15:77. This reasoning is consistent with this court's statement that since "policies usually are imposed on a take-it-or-leave-it basis . . . [t]he pretense that the parties had bargained for the resulting contract of insurance is an absurdity." *Storms v. U.S. Fidelity & Guar. Co.*, 118 N.H. at 430, 388 A.2d at 580.

Another argument in favor of the rule of strict construction is that, since the object of the contract is to provide protection for the insured, the construction that best achieves this purpose should be adopted. In upholding a construction of policy language favorable to the insured, the Massachusetts Supreme Judicial Court observed:

"[t]his interpretation is supported, also, by the general consideration that the purpose of a policy of insurance is to provide indemnity against losses . . . , and every rational intendment is made by the law to effectuate the design of the parties."

*Rosenthal v. Monarch Life Ins. Co.*, 290 Mass. 254, 258, 195 N.E. 339, 340 (1935).

In several recent decisions, this court has acknowledged the true state of affairs. *Storms, supra* at 430, 388 A.2d at 578; *Magulas v. Travelers Ins. Co.*, 114 N.H. 704, 706, 327 A.2d 608, 609 (1974). Thus the New Hampshire rule has been expanded so that, in interpreting an insurance contract, the court will "honor the reasonable expectations of the policyholder." *Magulas, supra* at 706, 327 A.2d at 609. It is but one step further to rule that an ambiguous insurance policy will be construed in favor of the insured and against the insurer. *See* 43 AM. JUR. 2d *Insurance*

§ 271, at 331 (1969). Today we take that step and adopt the majority rule. In so doing, we wish to make it clear that this is not a rule of general applicability to all coverage cases but will apply only in cases of ambiguity in policy language.

It is reasonable to expect that this decision will be more a change in form than in substance. By statute, the burden on the issue of coverage is upon the insurance company. RSA 491:22-a (Supp. 1979). In a case where the language of a policy is equally susceptible of two interpretations, the insurance company probably would not be able to carry its burden and the outcome would be the same as if the interpretation of the insured were to be adopted initially. This result obtained in a recent decision of this court in which we noted, "[i]f the company intended the snow removal hazard to have the narrow meaning it now urges, it should have used plainer language in its description of the hazard." *Brown v. City of Laconia*, 118 N.H. 376, 379, 386 A.2d 1276, 1278 (1978).

In the case now before us, the exclusion and nonduplication clauses in each of the certificates raise the question of whether Blue Cross may exclude hospitalization benefits *entirely* because Mrs. Trombly is "entitled" to Medicare benefits (Article VI) or whether the company may only *reduce* the amount of its payments by the amount actually paid by Medicare (Article X). Faced with a similar problem, another court concluded that the purpose of such exclusionary clauses was merely to *reduce* coverage where the insured had already been compensated by another insurer in order to avoid duplication of payment. *Hunt v. Hospital Service Plan of N.J.*, 33 N.J. 98, 104, 162 A.2d 561, 564 (1970). Because that reasonable interpretation best protects the expectations of the insured we adopt it here. We do not hold that Blue Cross/Blue Shield may never write a contract that would exclude certain benefits for Medicare eligibles but only note that it has not done so here.

Blue Cross/Blue Shield has used this contract language for many years. In 1976, it attempted to change its interpretation of the policy clauses without changing the language itself. It alone is responsible for the ambiguity and can therefore be reasonably held accountable for it. Assuming that the appropriate steps are taken to clarify the word "entitled" to require purchase of Medicare, Part B, Mrs. Trombly must do so. However, her benefits will merely be offset and not totally eliminated by virtue of Article X.

*Reversed.*

All concurred.