Strafford
No. 82-234

R. ZOPPO COMPANY, INC.

v.

CITY OF DOVER

April 9, 1984

668

*James A. Connor*, of Manchester, and *Peabody & Brown* of Boston (*Mr. Connor* and *Andrew R. Grainger* on the brief, and *Mr. Grainger* orally), for the plaintiff.

*Boynton, Waldron, Doleac, Woodman & Scott P.A.*, of Portsmouth (*Ralph R. Woodman, Jr.*, on the brief and orally), for the defendant.

BATCHELDER, J.   The plaintiff appeals from a superior court verdict in its favor in the amount of $28,823.25, seeking additional damages. The verdict was recommended by the Master (*Charles T. Gallagher*, Esq.) and was approved by the Superior Court (*Temple, J.*). The trial consolidated a contract action for damages and a peti-

tion for declaratory judgment brought by the plaintiff in connection with the construction of a sewage-separation project in the city of Dover. For the reasons which follow, we affirm in part and reverse in part.

In 1974, the defendant City of Dover (City) solicited bids for a construction project entailing the separation of its sewerage and waste water systems. The bid solicitation and evaluation were based on the City's specifications of the work to be done. On March 3, 1975, the plaintiff, R. Zoppo Company, Inc. (Zoppo), was awarded Contracts I and III of the project. Zoppo began work on both contracts in April 1975. The work included excavating trenches, laying sewer pipe, removing ledge, installing manholes, erecting a pumping station, and doing all of the incidental work connected therewith. The work performed by Zoppo was accepted by the City as "useably complete" in September 1977.

The two contracts were bid largely in terms of "unit prices." The City's proposal included a description of the work to be done, along with "estimated quantities" for each item for which a unit-price bid was sought. For example, for excavation of certain ledge in Contract III, estimated by the City to total 700 cubic yards, Zoppo bid a unit price of $30 per cubic yard.

The quantities actually encountered in performing the contracts greatly exceeded the estimated quantities set forth in the City's proposal. In Contract III, Zoppo actually encountered and removed 2,574.7 cubic yards of ledge instead of the 700 cubic yards estimated. In Contract I, the City estimated 200 cubic yards, while Zoppo actually encountered 2,188.1 cubic yards of ledge.

Zoppo was paid at the agreed unit price for the actual quantities encountered but has claimed that it is entitled to additional compensation from the City under the "equitable adjustment" clause present in each contract. This clause reads as follows:

> "Where the quantities originally contemplated are so changed that application of the agreed unit price to the quantity of work performed is shown to create a hardship to the Owner or the Contractor, there shall be an equitable adjustment of the Contract to prevent such hardship."

Zoppo contends that it presented sufficient evidence to demonstrate hardship based on the increased quantities, and, consequently, that the master erred in not awarding it additional compensation figured in terms of its actual cost of performance. Zoppo alleges that it suffered hardship in that the progress of its work was affected adversely by the additional time its crews had to spend on ledge excavation. Its allocation of work crews and equipment was

thus upset, which, in turn, increased its cost of performance over that which it had projected when it submitted its bid.

The master rejected Zoppo's contention that under the equitable adjustment clause it was entitled to additional compensation based on the actual costs it incurred in excavating the increased quantities of ledge. The master ruled that for there to be an equitable adjustment in a unit price, the presence of "some factor in addition to the extra quantity" must be shown. He concluded that "where extra quantities are involved, the plaintiff may not be awarded extra compensation simply because its unit costs, in retrospect, turned out to be in excess of its bid for any particular category of work." In applying these principles to Zoppo's claims relating to ledge excavation, the master rejected Zoppo's claim directed at Contract III, finding that: "There was no hardship imposed upon the plaintiff by the overrun [in quantities] except a hardship imposed by the plaintiff's bid if such bid was in fact inadequate."

With respect to Contract I, the master found that Zoppo *had* shown the "extra factor" in addition to the increased quantities. Accordingly, he ruled that Zoppo was entitled to an increase in its unit price from $20 to $30 per cubic yard for ledge that it had to "prestrip" prior to its being blasted and excavated. The master based his ruling on the unit price ($30 per cubic yard) to which Zoppo had agreed for excavating the ledge encountered in Contract III.

There was testimony that Zoppo had bid $20 per cubic yard of ledge for Contract I because it had reasonably assumed that the geography of the project-area would allow it to drill through the earthen overlay to the ledge and pre-blast the ledge. Additional testimony was also produced that this latter method is less expensive than the method of prestripping the ledge of its overlay prior to blasting and excavating. Contrary to its assumption, Zoppo had to prestrip much of the ledge it encountered in performing under Contract I. In Contract III, Zoppo bid $30 per cubic yard as the unit price for excavating the ledge because it assumed that the geography of that project area required the more expensive method of prestripping of the overlay prior to blasting and excavating. Rejecting Zoppo's claim for reimbursement of its *actual* cost, the master ruled that Zoppo had failed to convince the court of the accuracy of its cost calculation and also ruled that Zoppo was bound by the unit price it had bid in Contract III for excavating ledge that largely required prestripping.

The final interpretation of a contract is ultimately a question of law for this court. *Baker v. McCarthy*, 122 N.H. 171, 174–75,

443 A.2d 138, 140 (1982). In interpreting a contract, our inquiry focuses on the intent of the contracting parties at the time of the agreement. *Trombly v. Blue Cross/Blue Shield*, 120 N.H. 764, 770, 423 A.2d 980, 984 (1980). The language of a written contract will be given the interpretation that best reflects the parties' intentions. *Thiem v. Thomas*, 119 N.H. 598, 602, 406 A.2d 115, 118 (1979). Because interpreting a contract is, by necessity, fact-oriented, we will consider the situation of the parties at the time of their agreement and the object that was intended thereby, together with all the provisions of their agreement taken as a whole. *Commercial Union Assurance Co. v. Brown Co.*, 120 N.H. 620, 623, 419 A.2d 1111, 1113 (1980). When there is a question of fact concerning what was intended by certain terms within a contract, the dispute is to be resolved by the trier of fact, whose findings will be upheld if supported by the evidence. *Peabody v. Wentzell*, 123 N.H. 416, 418–19, 462 A.2d 105, 107 (1983).

After examining the contract as a whole and the remainder of the record, we are unable to find fault either with the master's interpretation of the equitable adjustment clause or with his application of that interpretation to Zoppo's claim for additional compensation for ledge excavation. *See generally J. E. Brenneman Co. v. Com. Dept. of Transp.*, 424 A.2d 592 (Pa. Commw. 1981); *Ray D. Lowder, Inc. v. N.C. State Hwy. Com'n*, 217 S.E.2d 682 (N.C. App. 1975).

It is clear that the quantities contained in the City's proposal were intended only as estimates against which the City could compare bids as part of its decision on what firm was to be awarded the contract. On the City's proposal sheet, the quantities listed are described as "estimated," "indeterminate" and "assumed for comparison of bids." In addition, that part of the proposal and contract entitled "Instructions and Information for Bidders" admonishes bidders to "make their own investigation of existing subsurface conditions" and to determine for themselves "the character, quantities, and conditions of the various materials and the work to be done." Moreover, the information on subsurface conditions provided by the City was predicated on "drilled test holes" which were "furnished only for the information and convenience of Bidders." This information was expressly not warranted or guaranteed; and, according to a separate provision of the proposal, the parties agreed not to base any claim on variances between the information offered and the actual materials encountered.

A reasonable reading of the equitable adjustment clause in the light of these provisions in each contract provides support for the

master's conclusion that a showing of increased quantities does not trigger the application of this clause, even where the contractor demonstrates that his cost to perform exceeded the agreed unit price. If we were to adopt Zoppo's reading of this clause, we would be transferring the risk that a bid was too low to provide a profit margin from the bidder to the City, as well as rendering the following provision in the contract a nullity:

> "The work to be done has been divided into parts or items to enable each Bidder to bid on the different portions of the work in accordance with his estimate of their cost and so that the actual quantity of work executed under each item may be paid for at the price bid for that particular item, even though such quantity is greater or less than the estimated quantity stated in the Proposal."

The master ruled that the unexpected necessity of prestripping the overburden in Contract I provided the "extra factor" required for the invocation of the equitable adjustment clause. The record supports this ruling. We also agree that, in the light of the contract's provisions regarding "unit price" and the uncertain evidence Zoppo presented on its actual costs, the master was correct in making the agreed unit price for excavating ledge in Contract III the basis for the equitable adjustment for Contract I.

Zoppo's second challenge to the master's interpretation of the equitable adjustment clause concerns the earth excavation it performed in connection with the digging of "test pits." The City had estimated that a total 2,200 cubic yards of earth would have to be excavated for Contracts I and III, while Zoppo actually excavated approximately 17,600 cubic yards. Zoppo bid $5 and $3 per cubic yard for the excavation for Contracts I and III, respectively.

Laying a new sewer main in a residential street requires not only installing the sewer pipe itself, but also installing connections whereby the service lines or laterals coming from each building can feed into the sewer main. The service line from each building can be located anywhere on the building's lot, or in some cases can cross into other properties. If a municipality cannot provide the contractor with information as to the location of the service connection, a trench or a "test pit" must be dug parallel to the property line until the service line is located.

With respect to this claim, the master made the following findings and ruling:

> "The inspector for the city marked the street curbs in front of each building where he thought the service line

was located. Some service lines were located as much as 20 feet away requiring an extraordinary amount of digging. The problem of finding the service lines interrupted the smooth operation of the service connection crews causing them to stand by idly until the line could be found and the trench dug to the main.

The plaintiff has been paid the unit price for all of the increased excavation. The plaintiff seeks additional compensation under the hardship clause for the excavation in excess of the estimated quantity.

Such additional compensation cannot be awarded for 'it is a basic rule of contract law that one who has contracted to do a thing for a stated price will not be entitled to extra compensation on account of encountering difficulties which have not been provided against in the contract.' *Salvucci v. State*, [110 N.H. 136, 147, 268 A.2d 899, 906 (1970)]."

Zoppo argues that in relying on *Salvucci*, the master erred as a matter of law inasmuch as the master's ruling ignores the equitable adjustment clause and the ameliorative effect that clause was meant to provide when unexpected hardship resulting from an increase in quantities occurs in the course of performance of the contract.

The master's findings, on their face, indicate that all of the requirements for the application of the equitable adjustment clause were present, including the "extra factor." Zoppo's excavations represented an approximately 800% increase over the estimated quantity of earth to be excavated. Also, Zoppo suffered hardship in that the operation of its work crews was repeatedly interrupted because of the unexpected difficulty in locating the service lines. This difficulty in locating the service lines cannot be attributed to Zoppo, as it was the City's engineers who decided where the digging of the test pits was to occur. Accordingly, we cannot say that Zoppo assumed this risk.

■■ We conclude that Zoppo's unexpected difficulties provided the necessary "extra factor" for the invocation of the equitable adjustment clause. Consequently, we shall remand for a finding of what adjustment (if any) in the unit price for each contract should be awarded Zoppo in order to make it whole. *See Bruce Construction Corporation v. United States*, 324 F.2d 516, 518 (Ct. Cl. 1963). An adjustment in unit price should be calculated in relation to the increased costs (if any) Zoppo faced by having its service connection crew idle while the unanticipated portion of the excavation took place. In assessing the increase in these costs, the master may con-

sider Zoppo's costs for labor, material and equipment associated with the service connection crew, as well as a proportionate amount of Zoppo's administrative overhead associated with this crew. Zoppo retains the burden of substantiating these costs and their relationship to the delay caused by the increased excavation.

Zoppo's third claim relates to the house service connections that it made, connecting the service lines emanating from buildings on the street to the main sewer lines. Zoppo contends that these connections were not required by the contract and, consequently, that it should receive extra compensation for each connection made.

The contract section dealing with service laterals begins with a general provision: "The Contractor shall furnish, lay, join, test, and mark all service laterals as specified herein and/or as directed by the Engineer." This provision is followed by a more specific subsection which provides: "The lateral pipe shall be properly capped with a watertight fitting for future connection to the house sewer." Zoppo points to this latter subsection and argues that the contract called only for it to cap the service laterals and not to connect them to the house service lines.

The master, relying on a provision in the section of the contract entitled "Measurement and Payment," recommended a ruling that the house service connections were required by the contract. This provision in a subsection headed "House Connections" reads: "The price for this item shall include full compensation for . . . connections to existing pipes (if required) . . . ."

The defendant maintains that the connections were required because the City's engineer said they were required while the construction was in progress. The plaintiff parries by stating that its bid was based on what was required in the City's proposal; namely, only capping the service laterals.

We agree with the plaintiff in its reading of the contract. The payment section of the contract cannot be relied upon, for it provides that payment for house service connections will be made if they are required by the contract. And, the contract does not expressly call for making these connections.

■ Therefore, we hold, as a matter of law, the master erred in his interpretation and in his denial of the plaintiff's claim for quantum meruit for this item of work performed. Consequently, we shall remand for a calculation of the amount by which the City was unjustly enriched by its having received the benefit of the house service connections without having paid for them. *See Petrie-Clemons v. Butterfield*, 122 N.H. 120, 127, 441 A.2d 1167, 1172 (1982).

Zoppo's fourth claim pertains to its installation of "pipe saddles,"

which were used to connect the lateral pipes to the sewer mains. The contract called for the use of "Y's" and "T's" to make these connections. The City decided, after the contract was signed, to change the method of making the connections, and an agreement was reached with Zoppo providing for Zoppo to install the pipe saddles at the same unit price ($30 per installation) at which it had agreed to install the "Y's" and "T's."

Zoppo contends that it is entitled to a unit price of $100 per installation. The basis for this claim is a settlement the City made with Seaward Construction Company (Seaward), another contractor performing work under a separate contract with the City as part of the same sewerage separation project, to pay Seaward $100 per installation. Zoppo maintains that its agreement in 1975 to accept $30 per installation was conditioned on the City's representation that Seaward would receive this same amount. Zoppo further argues that by not treating Zoppo and Seaward equally, the City breached an implied covenant to deal fairly with Zoppo. *See Seaward Constr. Co. v. City of Rochester*, 118 N.H. 128, 129, 383 A.2d 707, 708 (1978).

■ The master found that the evidence did not support Zoppo's allegation that the City represented to it that Seaward would receive only $30 per installation. Although the record suggests the possibility that such a representation could have been made, the facts do not demonstrate that Zoppo either relied on this representation in making its agreement or conditioned its agreement on Seaward's receiving the same amount for each installation. Nor can we conclude that the City acted inequitably in making a settlement with Seaward at a later time, for a different amount and concerning a different contract. Accordingly, we affirm the master's ruling on this claim.

Zoppo's final claim of error on this appeal concerns the master's finding that Zoppo had agreed to an offset of $8,427.75 on its claims against the City. The City had initially claimed that Zoppo owed it $20,486.86 for damage Zoppo had done to water pipes during the excavation on the City's streets. Pursuant to an agreement between the parties, Zoppo paid the City more than $11,000 on the claim. The master found that Zoppo agreed to pay the remaining $8,427.25 once its claims against the City were settled. Consequently, the master allowed the City an offset in that amount against the amounts that the master awarded Zoppo on its claims.

■ There is ample support in the record for the master's finding, and we, therefore, affirm the master on this claim.

*Affirmed in part; reversed in part; remanded.*

All concurred.