Hillsborough
No. 86-427

CENTRONICS DATA COMPUTER CORP.

v.

HARVEY SALZMAN

August 19, 1987

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*Andrew D. Dunn* and *Mark W. Dean* on the brief, and *Mr. Dean* orally), for the plaintiff.

*Schoen & Bagley P.C.*, of Manchester (*David K. Mulhern* on the brief and orally), for the defendant.

PER CURIAM. While Harvey Salzman was employed by Centronics Computer Data Corp. (Centronics), he bought restricted Centronics stock under an employees' stock purchase incentive plan. After he resigned his employment, Centronics brought a bill in equity to compel Salzman to deliver the restricted stock to Centronics in accordance with the terms of the plan, which gave Centronics certain repurchase rights. After a trial without jury, the Superior Court (*Dalianis*, J.) decreed judgment for Salzman. Centronics appeals, posing the question of whether the contract was ambiguous and, if so, whether a non-insurance contract is to be construed strictly against its drafter. We reverse and remand for further proceedings consistent with this opinion.

Centronics offered Salzman restricted shares on two occasions in 1981. In making the offers, Centronics neglected to give Salzman a copy of the ten-page "Restricted Stock Purchase Plan" (the Plan). Instead, Centronics gave Salzman a prospectus, which contained a summary of the Plan, but which did not refer to the particular provision of the Plan which has become the focus of this litigation. Nonetheless, Salzman testified that he read the Plan in 1981, and that he did not rely on the prospectus at the time he decided to. buy the stock. Salzman's acceptances of Centronics' offers expressly stated that he would abide by the terms of the Plan. The stock certificates bear a restrictive legend that refers to the Plan.

Under the Plan, Centronics issued stock to selected employees at a purchase price of ten cents per share, at a time when Centronics stock sold for approximately fifteen dollars per share on the open market. The testimony strongly suggests that the company's objective was to retain key employees at a time when the company experienced sudden financial losses and contended with personnel raiding by its competitors. In sections six and seven, the Plan prohibited the sale of the restricted stock until two years after the employee purchased it. After two years, the restrictions would lapse on twenty-five percent of the stock, with an additional twenty-five percent becoming unrestricted each successive year. Under section 7(f), "[u]pon the occurrence of an Event of Resale, all of a Purchaser's Restricted Shares on the date of such occurrence shall remain as Restricted Shares . . . ." Section 8(a) lists four events as Events of Resale. The two that are pertinent in this case are: 8(a)(i), "if the purchaser notifies the Corporation of his desire to transfer Restricted Shares[;]" and 8(a)(ii), "if the employment of the Purchaser by the Corporation or its subsidiaries is terminated." Section 8(b)(i) states:

> "Each Purchaser hereunder shall give the Corporation prompt notice of the occurrence of any Event of Resale which involves such Purchaser. Such notice shall specify the date of the occurrence of the Event of Resale and the Event of Resale which occurred, and, in the case of an Event of Resale described in paragraph eight (8)(a)(i), and the terms and conditions of the proposed transfer and the name and address of the proposed transferee, and shall offer for sale to the Corporation all Restricted Shares which the Purchaser owned on the date the Event of Resale occurred, at a price per share equal to the original price paid by the Purchaser for such shares ('Resale Price')."

Section 8(b)(ii) provides that, if the corporation does not accept this offer within twenty days of receiving it, then the restrictions lapse.

In contrast to section eight of the Plan, the prospectus does not mention the employee's obligation to offer back the remaining restricted shares. It states only that the restrictions lapse if the company does not elect to repurchase the restricted shares within twenty days after receiving notice that certain events have occurred. As in section eight of the Plan, these events include termination of employment or the employee's notice to the company that he or she desires to sell restricted shares. Thus, the prospectus gives the impression that the corporation bears the burden of protecting its buy-back rights.

Salzman sent a letter of resignation to his supervisor on August 4, 1982, less than two years after he bought restricted Centronics stock. The letter did not offer to sell back the stock, and Centronics made no effort at that time to buy it back. On November 10, 1982, Salzman sent a letter to Jeff Weinstein, Centronics' executive vice-president and general counsel, in which he requested Weinstein to have the corporation's stock transfer agent remove the restrictive legends in order that Salzman could sell the shares. This letter also did not contain an offer to sell back the shares to Centronics, as Salzman claimed in it that the restrictions had lapsed twenty days after the termination of his employment. Centronics did not reply to this letter until December 20, 1982, when it declined Salzman's request.

The critical question is whether the Plan required Salzman to offer back the shares or, instead, required Centronics to exercise its option to repurchase the shares even without an express offer from Salzman. To put the question in the phrasing of property law did Salzman's resignation give him a vested right to unrestricted ownership of the previously restricted stock, subject to Centronics' power to divest him within twenty days of his resignation? The trial court found that section 8(b)(i), requiring the employee to offer to sell back the stock, was ambiguous in that it could be read to refer only to a section 8(a)(i) proposed transfer, rather than to a section 8(a)(ii) employment termination or either of the other Events of Resale. The court then strictly construed the ambiguity against its drafter, citing *Trombly v. Blue Cross/Blue Shield*, 120 N.H. 764, 771, 423 A.2d 980, 984–85 (1980). The court further supported its decision by referring to Salzman's assertion that "the Prospectus [was] the only document he read relative to his shares" and by finding that the prospectus placed the onus of repurchasing on Centronics.

■■■ The meaning of a contract is ultimately a matter of law for this court to decide. *Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 710, 519 A.2d 256, 258 (1986). Our inquiry seeks to find the intent of the parties at the time of their agreement. *R. Zoppo Co. v. City of Dover*, 124 N.H. 666, 671, 475 A.2d 12, 15 (1984). We agree with the plaintiff that the trial court erred in applying *Trombly v. Blue Cross/Blue Shield* in the present case. The decision in *Trombly* concerned an insurance contract. This court has applied the rule of construction that interprets ambiguous contract language strictly against its writer only in the context of insurance contracts. The general rule applied to non-insurance contracts is that "no presumptions are to be indulged in either for or against a party who draws an agreement." *Thiem v. Thomas*, 119 N.H. 598, 602, 406 A.2d 115, 118 (1979) (quoting *Aldrich v. Beauregard & Sons*, 105 N.H. 330, 336, 200 A.2d 14, 18 (1964)). Doubts may be resolved against a grantor, for example, only when all other means of ascertaining the intent of the parties have failed. *Aldrich, id.* Generally, however, in ascertaining the intent of the parties, "[W]e will consider the situation of the parties at the time of their agreement and the object that was intended thereby, together with all the provisions of their agreement taken as a whole." *R. Zoppo Co. v. City of Dover supra.*

■■■ We discern no reason in the present case for applying the *Trombly* rule for construing ambiguity. As *Trombly* noted, insurers already bore a statutory burden of proving coverage did not exist, so that this court's rule was more a change of form than of substance. *Trombly*, 120 N.H. at 772, 423 A.2d at 985 (citing RSA 491:22-a). No such statutory policy underlies the present contractual relationship.

Applying the rules of construction to the present record, several facts strike us as crucial. In February 1981, the corporation's financial problems were common knowledge among it managerial and technical personnel, such as Salzman. Salzman recognized that the Plan was meant at least partially as an incentive for key employees to stay on. The corporation's executive vice-president testified that only Salzman among numerous employees who had resigned failed to return the stock, thus implying that the employees knew as common knowledge that the Plan was intended as a longevity incentive. Still more importantly, the Plan's schedule by which the restrictions gradually expire clearly indicates a purpose to reward longevity. Additionally, the wording of section 8(a) that labels termination of employment an Event of *Resale* (emphasis added), rather than an event of repurchase, and the

condition dictated by section 7(f), that "[u]pon the occurrence of an Event of Resale, all of a Purchaser's Restricted Shares on the date of such occurrence *shall remain as Restricted Shares*" (emphasis added), indicate that Salzman had no vested right to unrestricted ownership, subject to defeasance by Centronics. The repetitive usage of the conjunction "and" in the section 8(b)(i) requirement that the employee offer to sell back the stock does create some ambiguity, but the section must be construed bearing in mind that an interpretation which would permit the terminated employee to keep the stock would contradict both the Plan's purpose and the meaning of its whole text.

Further, Salzman testified that the prospectus was not a consideration in his decision to buy the stock but, rather, after he resigned, was the basis for his decision to keep it. As we have said, the critical moment for determining the parties' intent is the time when they made their agreement. At the time when Salzman bought the stock, he expressly agreed to abide by the Plan.

To summarize, the parties' intent in 1981 was manifested in the Plan and its purpose in light of the financial circumstances of the corporation. While the Plan's language is less than crystal clear, the attendant circumstances amply support the conclusion that the better reading of section 8(b)(i) is that it required Salzman to offer to sell back the stock to the corporation. Salzman never made that offer. Accordingly, he failed to comply with the terms of the Plan, and Centronics had no obligation to take any action with respect to Salzman's stock. The corporation's knowledge of his resignation and of his desire to sell the stock did not alone initiate the twenty-day period in which it had to repurchase the stock or surrender the restrictions. Judgment should be declared for the plaintiff to the extent that it compels the defendant to offer back his stock to the plaintiff, in accordance with section 8(b)(i) of the Plan.

*Reversed and remanded.*