LYNN, J., dissenting.
Given that the language of the IPL specifically states it "does not constitute an express or implied contract or a promise by IBM to make any distributions under it," I think the question of whether the IPL constitutes a binding contract is a close call. See Panto v. Moore Business Forms, Inc., 130 N.H. 730, 742, 547 A.2d 260 (1988) (stating that an employer who wishes to avoid liability for what might otherwise be viewed as benefit-conferring promises may do so "simply ... by announcing in the written policy itself that it was not an offer, or a policy enforceable as a contractual obligation"). However, despite this disclaimer, on balance I agree with the majority that the terms of the IPL sufficiently manifest an intent by IBM to be legally obligated to make incentive (commission) payments once they have been "earned." I disagree with the majority, however, that IBM breached the terms of the IPL, and I also believe that IBM did not violate the provisions of RSA 275:49 (Supp. 2016) or New Hampshire Administrative Rules, Lab 803.03 (Lab 803.03). I therefore would reverse the judgment of the trial court affirming the Department of Labor's (DOL) wage claim award and dismiss Khoury's claim.
I
IBM asserts that it did not breach the terms of the IPL or violate RSA 275:49 or *740 Lab 803.03 because the decision to change the commission quotas was made before Khoury's commission payments were "earned." In IBM's view, Khoury's payments were not "earned" until "after the measurement of complete business results following the end of the Full-[IPL] period," a phrase which IBM interprets to grant it the right to make adjustments of commission quotas "after it assessed the impact of its complete business results." (Quotation omitted.)
Khoury counters that IBM violated the terms of the IPL because the "measurement of business results" was completed on January 15, 2015, and IBM did not provide him with written notice of the change of his quota prior to that date. In particular, he asserts that neither the "measurement of business results" provision nor the "Adjustment for Errors" provision of the IPL provides support for IBM's position because, as the trial court concluded, these provisions merely allow for the correction of ministerial mistakes, such as misplacing a decimal point, but do not allow for IBM to rethink its commission scheme after commissions have been earned. Thus, Khoury argues that IBM's retroactive adjustment of his commission quotas was a violation of the IPL terms, as well as of RSA 275:49 and Lab 803.03.
Unlike the majority, I agree with IBM's construction of the IPL. The IPL states that incentive payments are "earned" "after the measurement of complete business results following the end of the full-[IPL] period." The IPL does not define the term "measurement." Therefore, reference to the dictionary to ascertain the common and ordinary meaning of the term is appropriate. See Hudson v. Farm Family Mut. Ins. Co., 142 N.H. 144, 147, 697 A.2d 501 (1997) ; see also Holloway Automotive Grp. v. Giacalone, 169 N.H. 623, 628, 154 A.3d 1246 (2017) ("Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the agreement."). The word "measurement" is defined, as pertinent here, as "the act or process of measuring something"; "an area, quantity, degree; or capacity obtained by measuring." Webster's Third New International Dictionary 1400 (unabridged ed. 2002). Likewise, "to measure" means, as relevant here, "to regulate or adjust by a rule or standard"; or "to judge or estimate the extent, strength, worth, or character of" or "to view appraisingly." Id.
The majority agrees that these definitions are accurate, but chooses instead to use an alternative definition ("measure" means "to ascertain the quantity, mass, extent, or degree of in terms of a standard unit or fixed amount," id.), which, it claims, when applied to "business results," permits IBM to engage only in "ministerial bean counting," such as correcting mathematical errors in sales figures, etc. I do not concede that the alternative definition relied upon by the majority cabins the meaning of "measure" in the way the majority asserts. But even if the majority's alternative definition could be so read, employing that definition here violates the fundamental principle of construction of written texts which holds that when two divergent meanings are possible, we must choose the one that produces reasonable results and eschew the one that produces illogical results. See Bovaird v. N.H. Dep't of Admin. Servs., 166 N.H. 755, 763, 103 A.3d 1207 (2014) ("As between a reasonable and unreasonable meaning of the language used, the reasonable meaning is to be adopted."); Marceau v. Concord Heritage Life Ins. Co., 149 N.H. 216, 220, 818 A.2d 1264 (2003) (declining to construe a statute so as to produce an illusory result contrary to legislative intent); Curtis v. Guaranty Trust Life Ins. Co., 132 N.H. 337, 342, 566 A.2d 176 (1989) (declining to interpret insurance policy language to reach an illogical *741 result); Thiem v. Thomas, 119 N.H. 598, 602-03, 406 A.2d 115 (1979) ("This court must, wherever possible, adopt the interpretation of an ambiguous clause that will be in harmony with the remainder of the document, so that all provisions will have meaning and effect.").[1] As explained below, the majority's construction of the term "measurement" causes the IPL to operate in an illogical and nonsensical manner.
The majority also contends that its narrow interpretation of what it means to "measure" "business results" furthers the purpose of the wage claim statute. As I explain in section II of the dissent, however, the opposite is true. Instead of furthering the purpose of the statute, the majority's construction of the IPL is based on a view of the statute that improperly expands its purpose by effectively requiring IBM to pay "wages" (commissions) that it did not agree to pay.
Applying the correct dictionary definitions here, I conclude that the trial court erred by interpreting the phrase "measurement of complete business results" as narrowly as it did. Rather, I would hold that "measurement of complete business results" encompasses not only the review, validation and calculation of various mathematical figures relating to the revenues and expenses of the previous business period, but also the ability to appraise the worth of such figures in connection with controlling or regulating strategic business decision-making. The "Adjustments for Errors" provision of the IPL supports this construction. It specifically states that IBM "reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives." (Emphasis added.) Read together, these provisions plainly contemplate, as IBM's Vice President of Sales Strategy and Transformation for North America, Susan Deyo, affirmed at the DOL hearing, that "measurement of complete business results" includes affording IBM the discretion to change quotas if it determines, as it did here, that they were originally established based upon an error or misjudgment as to projected deployments during the IPL term.[2]
*742 The majority's construction of the IPL does not withstand critical scrutiny. First, although the majority ignores this fact, it is important to note that the IPL contains no time limit, following the end of the "full-[IPL] period," within which the measurement of complete business results must be accomplished. Thus, even under the majority's construction of the term "measurement" as limited to ministerial bean-counting, the mere fact-which is all the record below establishes-that complete business results were available on January 15, 2015, does not mean that IBM actually measured them-or was required to have measured them-by that date. Since the IPL is silent as to the time period within which "measurement" must be accomplished, our customary method of contract construction would read into the IPL a requirement that IBM accomplish the measurement within a reasonable time. See Erin Food Services, Inc. v. Derry Motel, Inc., 131 N.H. 353, 360, 553 A.2d 304 (1988). Although Khoury's position before the DOL was that his commissions were earned no later than January 15, 2015, when IBM was aware of the complete business results for the IPL period, he made no independent claim that, if his construction of the IPL was incorrect, IBM nonetheless delayed unreasonably before it made the decision to alter the quota. Thus, there is no valid basis for concluding that the timeliness of IBM's measurement of complete business results violated the terms of the IPL.
The majority concedes, as it must, that at any time during or after the IPL period prior to the measurement of complete business results, IBM could have amended or cancelled the IPL in any way it chose. This means that at any time after Khoury had performed some or all of his duties under the contract, but while IBM had less than complete information on business results for the IPL period, IBM could have made the decision to retroactively increase (or cancel) Khoury's quota based either on ministerial or mathematical errors (so-called "bean counting" mistakes) or on substantive changes in the company's strategic planning or assessment of likely business outcomes for the period. Yet, according to the majority, the moment IBM possessed all the information (i.e., "complete business results") that would place it in a position to make the most intelligent decision-making as to whether substantive changes to the IPL should be made, it simultaneously lost the ability to do so. How can the creation of such a Catch 22 situation possibly be regarded as a sensible construct of the IPL?[3]
Accepting the majority's view, however tenuous, that IBM actually "measured" complete business results on January 15, 2015, if one day earlier, on January 14, it had enough of a hint as to what the results would show, it could have made the exact change to Khoury's quota that it made in April, without breaching the contract. Because the majority accepts that IBM could *743 have made such change, it simply makes no sense to interpret the IPL to mean that IBM suddenly lost the ability to do so when it obtained the complete results the next day. Khoury would certainly have been in no worse position because the decision to change the quota was made one day later since, even under the majority's construction of the IPL, IBM could have made the change subsequent to the close of the IPL period and, thus, after Khoury had already performed all the work on which his quota was based. The only sensible construction of the IPL is that it gives IBM a reasonable time after the receipt of complete business results to measure those results, not just to correct them for ministerial errors, but to substantively assess them, and then to make a decision as to whether to modify the IPL's terms, including changing the quota. See Wilson v. Int'l Bus. Machs. Corp., 610 Fed.Appx. 886, 889 (11th Cir. 2015) (per curiam) (interpreting terms of an IPL with pertinent language identical to that at issue here as providing: "Commissions are not earned ... until IBM assesses the impact of a significant transaction on an employee's sales quota." (emphasis added)).
I draw support for my view as to the proper construction of the IPL from the First Circuit Court of Appeals' recent decision in Walsh v. Zurich American Insurance Company, 853 F.3d 1 (1st Cir. 2017). Walsh was a diversity case removed to federal court, in which the plaintiff brought claims against his employer for, among other things, breach of contract and violation of New Hampshire's wage claim statute. Walsh, 853 F.3d at 7. The claims were based, in part, upon the plaintiff's contention that the employer wrongfully failed to pay him an incentive pursuant to a contemplated incentive plan (the Plan). Id. The Plan contained language providing that "INCENTIVE under the PLAN shall be solely within the discretion of the Executive Vice President of the [employer] and is subject to interpretation by him/her. The PLAN is subject to cancellation by the Executive Vice President at any time." Id. at 5 (quotation omitted). It also stated that "[m]anagement of the [employer] reserves the right to limit INCENTIVE in unique situations." Id. (quotation omitted). At trial, the district court declined to instruct the jury on the implied covenant of good faith and fair dealing because it decided that New Hampshire law barred the employer "from relying on the Plan's discretion provisions." Id. at 9, 10.
The First Circuit reversed, holding that the district court should have instructed the jurors that, if they found the Plan to be an enforceable agreement, "because the Plan expressly gave [the employer] discretion to limit incentive pay, they must go on to determine whether the [employer] reasonably and in good faith exercised that authority-i.e., whether the particular changes to [the plaintiff's] compensation package ... satisfied the implied contractual covenant of good faith." Id. at 15. It reasoned that, unlike the commission agreements at issue in cases such as Galloway v. Chicago-Soft, Ltd., 142 N.H. 752, 713 A.2d 982 (1998), on which the majority relies, the Plan did not give the plaintiff "a vested deferred compensation entitlement, equivalent to an ordinary commission." Id. at 11 (quotation omitted). After noting several factors that distinguished the Plan from an ordinary commission arrangement, the court observed:
[The plaintiff] was told in express terms that, notwithstanding the formula in the Plan, the incentive pay he will receive in the future may be limited by management in "unique situations." In other words, he was warned that his incentive pay may differ from the Plan's terms. He accepted the Plan with that warning.
Id. at 13.
Although the present case does not involve incentive payments for a unique *744 transaction, id. at 3, I find the First Circuit's reasoning persuasive. Like the plaintiff in Walsh, Khoury was specifically informed at the time he accepted the IPL that IBM could "adjust the [IPL] terms," which included making changes to the incentive quota, at any time up until incentive payments were "earned." He also was informed at the same time that payments were not "earned" until "after the measurement of complete business results following the end of the full-[IPL] period," which would not occur until IBM had completed its review of the entire IPL period and corrected any errors that may have occurred in, among other things, the creation or setting of his quota. Khoury accepted the terms of the IPL with this knowledge.
II
This brings me to the wage claim statute.[4] In considering Khoury's statutory claim, it is important to note at the outset that, other than in circumstances having no applicability to this case (e.g., payment of the minimum wage, etc.), no provision of the wage law, RSA 275:42 - :55 (2010 & Supp. 2016), can be read to impose upon an employer an obligation to pay commissions that it has not agreed to pay. Indeed, RSA 275:42, III (Supp. 2016) specifically defines "wages" as meaning "compensation, including ... other agreement[s] adopted for the benefit of an employee and agreed to by his employer, for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation." (Emphasis added.) See Demers Agency v. Widney, 155 N.H. 658, 662, 927 A.2d 1226 (2007) (noting, in upholding ruling that employee was entitled to bonus, "[o]ur holding is limited to those circumstances in which a bonus is part of an agreed-upon compensation package and the employee has performed all of the duties necessary to trigger the employer's obligation to pay the bonus" (emphasis added)). Thus, as long as the employer provides clear prior notice to the employee of the discretionary nature of his or her compensation, and the employee voluntarily agrees to such an arrangement, nothing in RSA chapter 275 precludes such an employment contract.
With the foregoing in mind, I now turn to the specific statutory provisions at issue. RSA 275:49 and its implementing regulations require that employers notify their employees in writing of their rate of pay at the time of hire, and also require that employers notify their employees in writing of any change in the rate of pay before the change becomes effective. See RSA 275:49, I, II; N.H. Admin. R., Lab 803.03(a), (c). The obvious purpose of these provisions is to insure that at-will employees, such as Khoury, who enter into unilateral contracts with employers, such as IBM, by accepting the employer's promise to pay wages in consideration for the performance of services, know in advance the rate of pay at which they will be compensated. This allows an employee who is not satisfied with the offer (or the proposed change to the offer) to decline it before he or she performs any work.
Here, IBM complied with RSA 275:49, I, and Lab 803.03(a) by notifying Khoury in the IPL, which was executed at the outset of the period it covered, that his commissions were subject to changes resulting from, among other things, IBM's reassessment *745 of the quotas needed to produce an appropriate level of incentive among its workforce. Thus, when IBM acted-in accordance with what it informed Khoury at the beginning of the contract it had the right to do-by modifying his quota, this did not constitute a "change" in the rate of pay within the meaning of RSA 275:49, II or Lab 803.03(a) and (c) for which IBM was required to provide Khoury some type of further advance notice. To read the statute or the regulation, as the DOL and the trial court did, to require such notice is to impose a meaningless redundancy that is illogical and does not accomplish the statutory purpose. See Favazza v. Braley, 160 N.H. 349, 351, 999 A.2d 1088 (2010) (stating that in construing a statute we "examine the statute's over-all objective and presume that the legislature would not pass an act that would lead to an absurd or illogical result"). Thus, even under the majority's construction of the IPL, IBM would have been entitled to change Khoury's quota retroactively after the conclusion of the IPL period up until complete business results were "measured" merely by providing him with written notice in advance that it intended to do so. But how would the receipt of such notice have served to "protect" Khoury in the manner contemplated by the statute? For example, if IBM had informed Khoury in writing on January 1 that it intended to modify his quota as of January 15, what could Khoury have done to "protect" himself? The answer is that he could have done nothing because he had already fully performed his side of the bargain by generating the deployments on which his commissions, of whatever amount, were based. For purposes of the statute, Khoury was in no worse position because he was not notified of the modification of his quota until after January 15.
The majority's implicit acknowledgment that the IPL validly gave IBM the ability to implement a change in Khoury's quota that applied retroactively to work he had already performed demonstrates the reality that RSA 275:49, II and the regulations that implement this paragraph of the statute have no applicability to this case. The attempt by the hearings officer and the trial court to apply these provisions nonetheless based on an asserted tardiness in IBM's providing post-performance notice of the measurement of business results produces a tortured construction that does not serve the protective purpose the statute is designed to achieve.
III
There is no question that the IPL, as properly construed, is a bargain heavily skewed in favor of IBM, in that it gives the company broad discretion to retroactively modify Khoury's quota. See Wilson, 610 Fed.Appx. at 889 ("The IPL may indeed include terms that are very favorable to IBM, but those are the terms Mr. Wilson admittedly accepted."). As we have long recognized, however, a contract which seemingly gives one party unrestricted discretion to modify its terms is subject to "an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting." Centronics Corp v. Genicom Corp., 132 N.H. 133, 143, 562 A.2d 187 (1989). Therefore, when one party takes discretionary action that is adverse to another party, we evaluate whether that "exercise of discretion exceeded the limits of reasonableness." Id. at 144, 562 A.2d 187. This evaluation "depends on identifying the common purpose or purposes of the contract, against which the reasonableness of the complaining party's expectations may be measured, and in furtherance of which community standards of honesty, decency and reasonableness can be applied." Id. We also evaluate whether the damage complained of is *746 caused by the acting party's abuse of discretion or by events that are beyond the control of either party --events against which the acting party has no obligation to protect the injured party. See id.
In this case, Khoury's position before the DOL was that IBM had no discretion to change his quota after what, in his view, was the "measurement" of complete business results that occurred on January 15, 2015. He never raised an alternative claim that, assuming the IPL authorized the retroactive increase of his quota, IBM acted unreasonably or in bad faith in doing so. Had he made this claim, I would have no hesitancy in remanding to the department to address the issue and determine if Khoury was entitled to relief on that basis. See Walsh, 853 F.3d at 15. However, since Khoury did not raise this issue, the issue is waived. I therefore would reverse the decision of the trial court and dismiss Khoury's claim for unpaid wages. I would also reverse the trial court's award of attorney's fees and statutory interest to Khoury.
As the above discussion demonstrates, it is hard to conclude other than that the majority has rendered a result-oriented decision, apparently driven by the view that the IPL could not possibly mean what it plainly says because that would be "unfair" to Mr. Khoury. The majority's well-meaning but paternalistic instinct to "protect" Khoury, a sales executive who, for the period in question, earned a base salary of $128,000 per year before any of the commissions at issue, by rewriting the contract to strike a better deal for him than he made for himself not only contravenes the proper bounds of judicial authority, see Olbres v. Hampton Coop. Bank, 142 N.H. 227, 233, 698 A.2d 1239 (1997) ("courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they may operate harshly or inequitably"), but also may portend unfortunate consequences for future employees, and even perhaps more broadly for our state.[5] Now that, at least in New Hampshire, today's decision "interprets" clear contractual language in such a strained way as to make it all but impossible for IBM to utilize contracts that give it the option to adjust incentive quotas based on a retrospective analysis of results, going forward the company will likely be inclined to set quotas at sufficiently high levels to avoid the problem it experienced here. Thus, to use the example of this case, if forced to make the call in advance, next time IBM may decide that to give itself adequate "wiggle room" against an overpayment of commissions, it will set deployment quotas at, say, $1.2 million instead of $1 million. The result of such court-driven caution may thus be that sales executives like Khoury earn less in commissions than they would have prior to today's decision. Even more troubling is the prospect that, at least for national customers such as the U.S. Army (from which the deployment commissions at issue here were generated), a large company like IBM will simply decide to relocate its sales force to states which do not undermine its freedom to contract in the way New Hampshire does under today's decision. Either of these eventualities seems particularly ironic in a state whose motto is "Live Free or Die." I respectfully dissent.

The majority's reliance on cases such as Trombly v. Blue Cross/Blue Shield, 120 N.H. 764, 423 A.2d 980 (1980), in which we have construed ambiguous language in insurance policies, assuming it is even applicable in a non-insurance context, but see Centronics Data Corp. v. Salzman, 129 N.H. 692, 696, 531 A.2d 348 (1987) ("This court has applied the rule of construction that interprets ambiguous contract language strictly against the writer only in the context of insurance contracts."), is unavailing for the same reasons discussed in the text. That is, even when construing insurance policies that arguably contain ambiguous terms, we have held that the insured is entitled to the benefit of the alleged ambiguity only if the insured's construction of the policy language is reasonable, EnergyNorth Natural Gas v. Continental Ins. Co., 146 N.H. 156, 159, 781 A.2d 969 (2001), and we have cautioned that we will not contort policy language to force an ambiguity merely for the purpose of resolving it in favor of the insured so as to afford coverage, id. The majority ignores that admonition here.

I do not agree with the majority's contention that, unlike the "Right to Modify or Cancel" section of the IPL, the "Adjustments for Errors" section allows errors to be corrected after commissions have been "earned." Neither of the foregoing sections of the IPL define when commissions are "earned." Instead, that definition is contained in the "Full-Plan Earnings" section of the IPL, which states that "[commissions] are earned ... only after the measurement of complete business results following the end of the IPL period." Thus, although the "Adjustments for Errors" section does allow for the recapture of payments that may have been released before an error has been discovered, the most sensible construction of these provisions, read as a whole, is that until errors have been discovered and corrected, the "measurement of complete business results" has not occurred and therefore commissions have not been "earned." (Emphasis added.) Per the "Full-Plan Earnings" section of the IPL, payments made before the time they are "earned" are considered "advance payments," which is why they can be recaptured.

Joseph Heller, the author of Catch-22 (Simon & Schuster 1961), must be smiling down from above, content in the knowledge that the paradoxical reasoning described in his novel lives on. Mr Heller died in 1999. See https://en.wikipedia.org/wiki/Joseph_Heller (last visited Dec. 10, 2017).

Although the majority finds it unnecessary to address the statutory claim, because I would reverse the trial court's decision affirming the DOL's wage claim award I must address this claim since it provides an alternative ground on which that decision arguably could be sustained.

The majority professes dismay at the "tone" of the dissent. Understandably, it would prefer that I describe the folly of its position less bluntly, so that our differences might be described as a mere academic dispute over some fine point of contract law. Sometimes, however, lest legal rhetoric mask reality, it is necessary to point out that the emperor has no clothes. Unfortunately, this is one of those occasions.