Rockingham
No. 95-670

TAMARA C. OLBRES & *a.*

v.

HAMPTON COOPERATIVE BANK

August 6, 1997

*Shaines & McEachern, P.A.*, of Portsmouth (*John H. McEachern* on the brief and orally), for the plaintiffs.

*Casassa and Ryan*, of Hampton (*John J. Ryan* on the brief and orally), for the defendant.

*Gallagher, Callahan & Gartrell, P.A.*, of Concord (*Daniel E. Lyford* on the brief), for the New Hampshire Bankers Association, as *amicus curiae*.

HORTON, J., Following a bench trial in Superior Court (*Gray*, J.) arising from a failed loan transaction, the court concluded: (1) that the defendant, Hampton Cooperative Bank, did not owe or breach any duty to plaintiff Tamara C. Olbres (Tamara) in setting off funds deposited pursuant to RSA chapter 384-D (1983) by her parents, plaintiffs Anthony Olbres and Shirley Olbres (the Olbreses); (2) that the defendant violated a duty of good faith owed to the Olbreses by setting off the deposited funds; (3) that the defendant did not act improperly in failing to disburse loan funds; and (4) that the defendant did not act negligently, wrongfully, or in bad faith in regard to a foreclosure sale. The defendant appeals the court's ruling as to its violation of a duty of good faith; the plaintiffs cross-appeal the court's other rulings. We affirm in part, reverse in part, and remand.

The trial court found the following facts. In 1991, the Olbreses successfully applied for a $300,000 loan from the defendant in order to pay off existing mortgage indebtedness and to fund improvements to fire-damaged commercial property. As part of this construction loan transaction, the defendant agreed to reduce the interest rate in exchange for the Olbreses' agreement to establish a $100,000 certificate of deposit (CD) account with the defendant for a three-year term. The transaction closed in October 1991, when the parties executed various loan documents and the Olbreses established a $100,000 CD account "ITF Tamara C. OLBRES" — in trust for Tamara. It is undisputed that Tamara did not contribute any funds toward the $100,000 CD account.

The promissory note signed by the Olbreses provides in relevant part:

### No Rights of Set-Off by Borrower.

No payment of principal hereof or interest hereon shall be subject to set-off, reduction or recoupment by the Borrower for any cause whatsoever relating to or based on dealings between the Borrower and the Lender or any subsequent Holder. In addition to the foregoing, any and all of the deposits or other sums at any time credited by or due from Lender to Borrower or to any endorser or guarantor of this Note, and any cash, securities, instruments, or other property of Borrower or of any endorser or guarantor, whether for safekeeping, or otherwise, shall at all times constitute security for this Note, and may be applied or set off by you against such liabilities at any time whether or not such liabilities are then due and whether or not other collateral is available to Lender.

Subsequent to the closing, the Olbreses failed to honor some of the defendant's requests for financial information and construction plans. The defendant therefore classified the loan as substandard. In March 1993, the defendant set off the funds in the CD account against the balance of the loan, thereby reducing it from the then current balance of $200,000 to $100,000. At the time of the defendant's set-off, the Olbreses were current with payments on the loan.

In July 1993, the Olbreses ceased making payments, and the defendant subsequently foreclosed on the commercial property that secured the loan. The property, which had been appraised prior to the loan at $330,000, was sold by the defendant for $135,000 in February 1994. The defendant applied the proceeds from the foreclosure sale to satisfy the loan, including outstanding interest and associated costs, and retained surplus proceeds of approximately $18,000. The defendant refused to turn over the surplus proceeds because of knowledge of a federal tax lien on any property of the Olbreses in its possession and because of uncertainty about the outcome of this litigation.

After the defendant's set-off, the plaintiffs commenced this action alleging that the defendant acted wrongfully in converting funds of Tamara in the CD account and in refusing to disburse loan funds to the Olbreses. Following the foreclosure, the plaintiffs asserted additional claims based on wrongful foreclosure, failure to obtain a higher price for the property, and improper retention of the surplus proceeds of $18,000.

The trial court ruled that the CD account belonged to the Olbreses, not Tamara, *see* RSA 384-D:2, I(a), and that the defendant therefore breached no duty to Tamara in setting off the CD account. The court reasoned, however, that the note provision authorizing set-off

> obligated the [defendant] to exercise good faith in exercising that right. The Court finds that the [defendant] did not exercise good faith when it set-off the loan balance with the CD account funds at a time when no payments were due on the Note. The [defendant's] feelings of insecurity based on the [Olbreses'] refusal to provide all financial information requested at that time is not enough to overcome this finding.

Accordingly, the trial court awarded the Olbreses damages in the amount of $100,000. As to the plaintiffs' claim that the defendant acted negligently or in bad faith by failing to disburse loan funds, the court found for the defendant: "The evidence shows that the plaintiffs failed to present sufficient plans and other information to justify the disbursement of the construction loan funds." The court also found for the defendant on the plaintiffs' claim that the defendant acted wrongfully with respect to the foreclosure, ruling that the defendant "adequately advertised the property and otherwise acted in a reasonable manner." Finally, the court concluded that the defendant's knowledge of the federal tax lien provided sufficient justification for its refusal to turn over the $18,000 of surplus proceeds from the foreclosure sale.

Both sides appeal. The defendant argues that the trial court erred in concluding that it violated a duty of good faith in setting off the CD account because: (1) the terms of the note plainly permitted its action; and (2) the Olbreses' failure to provide financial and construction information constituted a permissible reason for the set-off. The plaintiffs argue that the superior court erred: (1) in interpreting RSA 384-D:2 to mean that the CD account was the property of the Olbreses, rather than Tamara; (2) in finding that the defendant did not act wrongfully in refusing to disburse loan funds; (3) in finding that the defendant's actions with respect to the foreclosure sale were not wrongful; and (4) in failing to order the defendant to turn over the surplus proceeds of $18,000.

"We will not disturb the findings of the trial court unless they lack evidentiary support or are erroneous as a matter of law." *Key Bank of Maine v. Latshaw*, 140 N.H. 634, 636, 670 A.2d 1041, 1043 (1996). Legal conclusions, as well as the application of law to fact, "are

reviewed independently for plain error." *Fleet Bank-N.H. v. Chain Constr. Corp.*, 138 N.H. 136, 139, 635 A.2d 1348, 1350 (1993). Accordingly, "[o]ur inquiry is to determine whether the evidence presented to the trial court reasonably supports the court's findings, and then whether the court's decision is consonant with applicable law." *Id.*

## I. Interpretation of RSA Chapter 384-D

RSA chapter 384-D concerns various aspects of trust deposits in banks, including certificates of deposit, *see* RSA 384-D:6, II. According to the statute, a deposit made in the name of two individual depositors in trust for a named beneficiary creates "a trust of the moneys at any time standing to the credit of such account for the named beneficiary, with the individual depositors . . . as trustees." RSA 384-D:2, I. A trust created in such a manner, however, is

> revocable at will by each of the individual depositors or the survivor of them, but only to the extent of withdrawals of, charges against or pledges of the moneys to the credit of the account made or authorized by the individual depositors or either of them during their respective lives. Each such withdrawal or charge, and each such pledge to the extent not subsequently redeemed, shall constitute a pro tanto revocation of such trust.

RSA 384-D:2, I(a).

The parties do not dispute that these statutory provisions govern the $100,000 CD account established by the Olbreses in trust for Tamara. The plaintiffs argue that the CD account was either Tamara's property or the property of the Olbreses *as trustees*, but not the property of the Olbreses *as individuals*. They therefore contend that the trial court erred in ruling that the CD account was subject to the set-off provision of the note. We disagree.

We distinguish a trust arising pursuant to RSA 384-D:2, I, from trusts created by will, trust agreement, other fiduciary instrument, statute, court decree, or fiduciary relationship. *See* RSA 384-D:3 (identifying types of bank deposit trusts to which RSA chapter 384-D does not apply). In the typical trust, a trustee holds legal title to the trust property, but the property is not subject to the trustee's debts. *See* 6 AM. JUR. 2D *Attachment and Garnishment* § 194 (1963); *cf. Dow v. Sayward*, 14 N.H. 9, 15-16 (1843). A different rule applies, however, to bank deposit trusts such as those created pursuant to RSA 384-D:2.

> In one type of trust it is well settled that the creditors of the settlor can reach the trust property. This is the trust that arises where a person deposits money in a savings account in his name as trustee for another. It is generally held that he thereby creates what is known as a tentative trust. The inference is that the depositor reserves the power to do as he likes with the deposit as long as he lives, but if he dies leaving the money or a part of it in the deposit and has not indicated his intention to revoke the trust either by acts done during his lifetime or by his will, the named beneficiary on his death is entitled to the amount then on deposit. . . . Since the depositor has complete control over the deposit during his lifetime, however, he is treated as the owner insofar as his creditors are concerned. His creditors can reach the deposit while he is living . . . .

IV A. SCOTT & W. FRATCHER, THE LAW OF TRUSTS § 330.12, at 377-78 (4th ed. 1989); *see also* RESTATEMENT (SECOND) OF TRUSTS § 58 comment *id.* at 157 (1959).

Numerous courts have held that creditors of a depositor are entitled to reach the funds in an "in trust for" bank account because the depositor retains virtually unlimited control over the funds during life. *See, e.g., Farrell v. Coulter*, 898 S.W.2d 139, 140 (Mo. Ct. App. 1995); *Soto v. First Gibraltar Bank*, 868 S.W.2d 400, 402-03 (Tex. Ct. App. 1993). Our statute requires a similar holding. For example, RSA 384-D:4, II specifically provides that "[n]othing in this chapter shall impair the rights of creditors of a depositor establishing a trust deposit in any form described herein." Moreover, the named beneficiary who survives the depositors takes the funds in the account "free and clear of the trust," but "less all proper set-offs or reductions pursuant to any pledge." RSA 384-D:2, I(d). Accordingly, we hold that the trial court correctly concluded that the CD account was the property of the Olbreses and subject to any charges, encumbrances, or withdrawals imposed by them, including the set-off provision of the note. *See* RSA 384-D:2, I(a).

## II. Duty of Good Faith

After ruling that the CD account was subject to the set-off provision, the trial court concluded that the defendant violated a duty of good faith by exercising its set-off rights at a time when the Olbreses were current with payments. As the trial court recognized, the note itself contains no such limitation on the defendant's set-off rights. Rather, the note authorizes set-off "at any time whether or not such liabilities are then due."

■ Relying on this broad language, the defendant argues that the duty of good faith and fair dealing is wholly inapplicable to the set-off provision. We disagree. "Every contract . . . imposes an obligation of good faith in its performance or enforcement." RSA 382-A:1-203 (1994); *cf. Harper v. Healthsource New Hampshire*, 140 N.H. 770, 775, 674 A.2d 962, 965 (1996). Nonetheless, we cannot accept the trial court's implicit legal conclusion that good faith required the defendant to refrain from setting off the CD account until payments became overdue. Construing the note to require a payment default as a precondition to set-off is inconsistent with the principles that "[p]arties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably." *Mills v. Nashua Fed. Sav's and Loan Assoc.*, 121 N.H. 722, 726, 433 A.2d 1312, 1315 (1981) (discussing acceleration clause in mortgage instrument).

Because we hold that the trial court erred in relying solely on the fact that payments were not overdue, we reverse and remand for further findings and rulings consistent with this opinion. On remand, the trial court should determine whether the plaintiffs satisfied their burden of establishing that the defendant did not in good faith believe that the prospect of payment or performance by the Olbreses was impaired. *See* RSA 382-A:1-208 (1994).

*III. Remaining Issues*

■ The plaintiffs challenge the trial court's ruling that the defendant did not act wrongfully in refusing to disburse construction loan funds. The court found that the Olbreses "failed to present sufficient plans and other information to justify the disbursement of the construction loan funds." We affirm this ruling as it is both supported by the evidence, including the testimony of Anthony Olbres, and consonant with the parties' agreement, which provided for "plans to be submitted to Lender for approval prior to disbursement of construction funds." *See Fleet Bank-N.H.*, 138 N.H. at 139, 635 A.2d at 1350.

The plaintiffs next argue that the bids received at the foreclosure sale were so low that the defendant had an obligation to adjourn the sale. *See Murphy v. Financial Development Corp.*, 126 N.H. 536, 541, 495 A.2d 1245, 1249-50 (1985) (discussing mortgagee's duty to receive a fair and reasonable price at foreclosure sale). In support of that argument, the plaintiffs ask us to compare the $135,000 price received at the foreclosure sale to both pre-loan appraisals reflect-

ing a value for the property equal to or exceeding $330,000 and the plaintiffs' pre-foreclosure appraisal indicating a value of $325,000 and a liquidation value of $190,000.

■ The evidence adduced at trial, however, revealed a post-closing appraisal initiated by the defendant that valued the property at $90,000. In addition, Anthony Olbres acknowledged that the appraiser who conducted the Olbreses' pre-foreclosure appraisal was unable to obtain a buyer for the property. Moreover, we agree with the trial court's reasoning that the *1991* appraisals are not conclusive of what constituted a fair price at the *1994* foreclosure sale. *Cf. Hillebrand v. Hillebrand*, 130 N.H. 520, 524, 546 A.2d 1047, 1049 (1988) (discussing, in context of valuation date for marital assets, tendency of real estate to fluctuate in value). With regard to the 1994 foreclosure sale, testimony from the defendant's former president concerning advertisement, bidding, and surrounding circumstances supports the trial court's finding that the defendant "adequately advertised the property and otherwise acted in a reasonable manner." Accordingly, we cannot conclude that the price obtained at the foreclosure sale was "so low as to shock the judicial conscience," *Murphy*, 126 N.H. at 541, 495 A.2d at 1250, or that the trial court erred in finding that the plaintiffs failed to demonstrate negligence, bad faith, or a lack of due diligence on the part of the defendant.

■ The final issue concerns the surplus proceeds of approximately $18,000 from the foreclosure sale. The defendant argues that resolution of the surplus proceeds issue depends on the outcome of other issues, including the propriety of the defendant's set-off. We agree and, therefore, remand the surplus proceeds issue to the trial court. In remanding, we necessarily reject the plaintiffs' contention that the defendant's failure to assert a counterclaim to retain the surplus proceeds forecloses the defendant's continued litigation of this issue.

*Affirmed in part; reversed in part; remanded.*

All concurred.