Pierce, Laurence D., J.
In this action the plaintiff, Ellen Johnson, M.D. (“Dr. Johnson”), alleges that the defendant, ProSelect Insurance Company (“ProS-elect”), acted negligently and breached its duty of good faith in the defense of a medical malpractice action against Dr. Johnson by failing to investigate the case, properly evaluate the liability risks, and undertake pre-trial settlement negotiations. Dr. Johnson also contends that ProSelect failed to pursue post-trial motions and an appeal, and instead settled the case against her wishes after an adverse jury verdict. Her Complaint and Jury Demand (the “Complaint”) in this matter contains three counts: negligent defense (Count I); negligent refusal to pursue post-trial motions and an appeal (Count A); and breach of the insurance contract (Count in). ProSelect now moves for summary judgment.
For the reasons discussed below, ProSelect’s motion for summary judgment is ALLOWED.
FACTUAL BACKGROUND
The following facts, viewed in the light most favorable to the plaintiff, are taken from the Consolidated *638 Statement of Undisputed Material Facts (“SUMF”). Some facts are reserved for discussion below.
Dr. Johnson is a medical doctor specializing in radiology. SUMF, ¶1. ProSelect is an insurer providing professional liability coverage to healthcare professionals. Id. at 12. At all times relevant to this dispute, ProSelect was the medical malpractice insurer for Dr. Johnson and Advanced Diagnostic Imaging, PLLC (“ADI”), Dr. Johnson’s employer. Id. at 17. The total available coverage under the applicable malpractice policy issued to Dr. Johnson and .ADI was $4 million dollars.[1] Id. at! 13.
I. The ProSelect Policy and Applicable Case Management Guidelines
Dr. Johnson’s ProSelect policy provides, in pertinent part: “[ProSelect] shall have the right and duly to defend with defense counsel selected by US . . . and WE may make any investigation and settlement of any CLAIM or SUIT as WE deem expedient.” Id. at 120. The policy also includes a “Consent to Settle Endorsement” that provides: “[ProSelect] shall not settle any CLAIM or SUIT against any practitioner scheduled on the Group Schedule attached to the DECLARATIONS . . . without that SCHEDULED PRACTITIONER’S written consent . . . If the SCHEDULED PRACTITIONER consents to settlement or is deemed to have consented, then WE may settle the CLAIM or SUIT for such amount up to the applicable Limit of Liability of the POLICY and on such terms as WE in OUR sole judgment determine. WE shall not be obligated to obtain consent to settle any CLAIM or SUIT against any SCHEDULED PRACTITIONER: (1) After a jury verdict, judgment, or any other ruling by a court establishing that SCHEDULED PRACTITIONER’S liability regardless of whether such verdict, judgment or ruling is subject to appeal or further judicial review.” Id. at ¶22.
ProSelect is affiliated with Coveiys, a larger group of professional malpractice insurers. As such, ProS-elect employs various Coveiys business practices and procedures. The applicable “Coverys Case Management Guidelines,” which among other things, “provide] ] an outline of the roles and responsibilities of the [ProSelect] Claim Representative and defense counsel,” include the following provision: “Coverys expects to be kept advised of case developments, and further expects to be generally involved in developing defense strategies. However, by accepting assignments from Coverys, counsel acknowledge and agree that they are independent contractors, that they are solely responsible for directing and controlling the details of the insured’s defense, and that they owe an ethical obligation to the insured to exercise their independent professional judgment in matters concerning the defense of the insured." Case Management Guidelines, attached to SUMF as Exhibit 23, p. 1.
The Case Management Guidelines also include the following claim department responsibilities: “Investigations will be coordinated and conducted by the assigned Claim Representative. On occasion, defense counsel will be requested to assume certain limited claim investigation responsibilities.” Id. at p. 3. The Guidelines further state that it is the claim representative’s responsibility to “develop and refine the investigation plan for the case” and “coordinate the selection of all experts, investigators and consultants.” Id. Meanwhile, the Guidelines explain that defense counsel is responsible for ”conduct[ing] general investigation activities when requested, which minimally include: interviewing involved insureds and/or their staffs; obtaining relevant documents; identifying other potentially culpable parties; reporting findings to the Claim Representative; and providing a concise sum-maiy of case facts to the Claim Representative.” Id.
II. The Underlying New Hampshire Litigation
In July 2010, Noel Jodoin and her husband filed a complaint in Rockingham County Superior Court in New Hampshire, alleging that on August 9, 2007, Mrs. Jodoin received negligent care from Dr. Johnson, ADI and other medical professionals at Exeter Hospital in Exeter, New Hampshire, and that as a result she suffered a stroke (the “Jodoin case”). SUMF at ¶5. The other named defendants included physician assistant Heidi Hatch (“PA Hatch”), Exeter Hospital Emergency Department (“ED”) physician Dr. Raymond. Kelly (“Dr. Kelly”), Exeter Emergency Physicians, VA., and neurologist Dr. Ken Logan (“Dr. Logan”). Id. at 116, 96.. Attorney J. Peter Kelley (“Attorney Kelley”) was retained by ProSelect to represent Dr. Johnson and ADI in the Jodoin case. Id. at 18. Attorney Kelley has been a practicing attorney since 1991 and is licensed to practice in Massachusetts and New Hampshire. Id. at ¶70. He has been litigating and trying medical malpractice cases since 1998. Id. at 171.
The Jodoin case was litigated for approximately two years. Before the case went to trial, the Jodoins’ claims against all of the defendants, other than Dr. Johnson, were either dismissed or settled. Id. at 119-10. In August 2011, the Jodoins filed notice of a voluntary non-suit as to defendants Dr. Kelly, PA Hatch, and Exeter Emergency Physicians, P.A. Id. at ¶96. Attorney Kelley sought to learn the reasons for the dismissal, but was unable to learn anything beyond that the plaintiffs, “in their consideration of the case [had] determined to drop PA Hatch and Dr. Kelly as defendants.” Id. at 197. Dr. Logan settled with the plaintiffs shortly before trial for $950,000. Id. at 1110.
A jury trial of the remaining claims against Dr. Johnson took place November 5 through November 12, 2012. Id. at 111. At the conclusion of the trial, the juiy returned a verdict against Dr. Johnson, awarding $4 million to Mrs. Jodoin and $1 million to her husband for loss of consortium. Id. at 112. On or about November 29, 2012, ProSelect settled the case on behalf of Dr. Johnson and ADI for $3.75 million. Id. at 113.
*639 III. The Care at Issue in the Jodoin Case
The facts of the Jodoin case focused on Mrs. Jodoin’s presentation to Exeter Hospital on the morning of August 9, 2007, complaining of a persistent headache, and Dr. Johnson’s subsequent communications with ED providers following a head CT scan. Id. at 1124-25, 42-48. Mrs. Jodoin was triaged, seen by PA Hatch, treated for a “migrainous headache,” noted to be feeling better, and prepared for discharge. Id. at 1126-29. Prior to discharge, Mrs. Jodoin was found to have slurred speech, altered mental state, a tingling sensation on her right side, and inability to move her right arm. Id. at ¶30. Dr. Kelly and PA Hatch saw Mrs. Jodoin after these changes were noted, and Dr. Kelly ordered a CT scan at 12:21 p.m. Id. at ¶¶32-34. The CT scan was performed between 12:48 p.m. and 12:52 p.m. Id. at 135.' Dr. Johnson reviewed the CT scan and at 1:21 p.m. dictated the following report: ‘There is no evidence of acute hemorrhage, mass lesion, mass effect, acute ischemia, or extra axial fluid collections. The ventricles are midline and symmetric. The basilar cisterns are patent. Gray white differentiation is maintained. The dural veins anteri-orly appear mildly prominent. This is of doubtful clinical significance.” Id. at 138. The dictation was available to the ED providers as of 1:21 p.m., although the dictated report was not transcribed until 4:51 p.m. Id. at 1139-40. Dr. Johnson issued and closed at 1:40 p.m. a “Wet Read”[2] which indicated the film was “negative.” Id. at 141.
Notwithstanding the dictated report and Wet Read, at trial, Dr. Johnson testified that she called and spoke with PA Hatch on two occasions about her review of the CT films, indicating some concerns and that she recommended an MRI. Id. at 142. Dr. Johnson asserted that, after opening the CT scan to review and prior to closing the Wet Read, she called and spoke with PA Hatch on two separate occasions to “discuss the patient and the observed prominence of the anterior dural veins.” Id. at 143. Dr. Johnson testified that she informed PA Hatch over the telephone that this warranted further investigation to be sure it was not the sign of a more serious problem and warranted an MRI. Id. at 143. Dr. Johnson did not make any note or written record of either of these two calls to PA Hatch, but argues that the calls were evidenced by the fact that Dr. Johnson ordered an emergency MRI add-on and that this was scheduled. Id. at 152. An MRI order was entered at 1:56 p.m. and Mrs. Jodoin was put on the emergency add-on list for 2:05 p.m., but Dr. Kelly subsequently cancelled the MRI based on the patient’s deteriorating condition. Id. at 147. Meanwhile, PA Hatch and Dr. Logan testified that they did not receive any call or speak with Dr. Johnson about any concerns she had about the CT scan and that they relied on the negative Wet Read report. Id. at 148. There is no written note or record in the ED records, or by PA Hatch, of any calls made or received by Dr. Johnson. Id. at 155.
Dr. Johnson also testified at trial that she consulted with another radiologist working that day, Dr. Michael Marrero (“Dr. Marrero”), who opened the CT scan image on his own computer in his separate reading room. Id. at 149. Dr. Johnson testified that she told Dr. Marrero she wanted to recommend an MRI and that Dr. Marrero told her he thought that was overdoing it, but did not disagree. Id. at 50. Dr. Marrero was approached prior to trial and did not recall reviewing the CT scan with Dr. Johnson. Id. at 151.
Mrs. Jodoin’s condition worsened during the afternoon, with both PA Hatch and Dr. Kelly speaking with Dr. Logan, the on-call neurologist for Exeter Hospital, over the telephone at various times. Id. at 156. Dr. Logan examined Mrs. Jodoin in person sometime round 5:00 p.m. and ordered that she be transferred to the Brigham & Women’s Hospital in Boston. Id. at 158. At trial, there was testimony that a repeat CT scan performed following her transfer to the Brigham & Women’s Hospital “demonstrated bilateral intracran-ial hemorrhages with extension into the subarachnoid space and thrombosis of the superior sagittal sinus and diagnosed a dural sinus vein thrombosis (i.e., stroke).” Id. at 161.
IV. The Call Logs and Audit Trail Requests
Prior to trial, Attorney Kelley requested that Exeter Hospital produce information regarding access to Mrs. Jodoin’s CTscan and/or Wet Read and documentation of calls between radiology and the ED on August 9, 2007. Id. at 1164. In a May 10, 2012 letter, Attorney Kelley requested information including, “any and all documents, logs, and reports identifying telephonic or other communications between the radiology department and emergency department on August 9, 2007,” “documentation identifying the extensions from which communications originated and were received,” and “any and all logs, reports, or other documents that reflect each and eveiy access and/or edit of the wet read of Ms. Jodoin’s CT scan.” Id. at 183. On May 23, 2012, Exeter Hospital’s counsel responded, providing copies of various documents including a log showing calls to and from the three radiology reading rooms between 1:03 p.m. and 3:47 p.m. on August 9, 2011. Id. at 1170. With respect to access to the CT scan and/or Wet Read, Attorney Kelley, Dr. Johnson’s personal counsel, and Dr. Johnson’s husband each made separate requests for this information and were each told by Exeter Hospital that it had no such information. Id. at 11206-11.
On August 9, 2007, there were four radiologists working at Exeter Hospital and three separate reading rooms. Id. at 1165. Each reading room had its own telephone extension, either 6156, 6272, or 6181. Id. at 1166. The call log produced by Exeter Hospital on May 23, 2012 showed outgoing calls from the three separate radiology room extensions. Id. at 1171. After *640 Attorney Kelley provided the call log to Dr. Johnson, she reported that she believed the log confirmed her recollection of her calls and that she believed she had been at extension 6156 that day and made her calls to PA Hatch from that extension. Id. at ¶¶175-76. Dr. Johnson asserted that a 1:12 p.m. call from extension 6156 to extension 7009 (a hospital operator extension) was her first call to PA Hatch and that a call at 1:25 p.m. from extension 6156 to extension 7011 (another hospital operator extension) was her second call to PA Hatch. Id. at ¶177. The call log produced on May 23, 2012 did not indicate whether these two calls to hospital operator extensions were directed anywhere or to whom. Id. at 1178.
On the second day of trial, November 6, 2012, Exeter Hospital’s attorney emailed counsel enclosing another log identifying telephone calls made to extension 4034, which Exeter Hospital represented was the extension for PA Hatch. Id. at 1181. This new call log for extension 4034 showed no calls to or from radiology on August 9, 2007, Id. at 1182. Also during the trial, on or about November 8, 2012, counselfor the Jodoins identified Wendy Carrigan of Exeter Hospital as a witness they intended to call to testify about the call logs and telephone system. Id. at 1183. Ms. Carrigan had not previously been identified as a witness. Id. Attorney Kelley sought to preclude Ms. Carrigan’s testimony, but the trial judge denied his motion. Id. at 1184. Ms. Carrigan’s testimony was taken by deposition on November 9, 2012, as she was leaving for an out-of-state vacation on November 10, 2012. Id. at 1185. The trial deposition was immediately preceded by a discovery deposition. Id. At her discovery deposition, Ms. Carrigan produced two additional call logs from August 9,2007, as well as another version of the radiology extension call log and a copy of the call log for extension 4034. Id. at 1186. The two additional logs produced showed all calls made to or from the internal operators’ extensions (7009 and 7011), but did not show where calls to the operator were transferred by the operator. Id. at 1187. The internal operator call logs did not show any calls going from extensions 7009 or 7011 to an ED extension, although Ms. Carrigan disclosed after the verdict that “call splitting” was not set up on the system to show where the operators transferred the calls. Id. at 11188, 200. During her deposition, Ms. Carrigan was unable to explain why the call logs for extensions 7009 and 7011 did not show the calls from extension 6156 at 1:12 p.m. and 1:25 p.m. Id. at 1189. She agreed to investigate the issue and get back to counsel. Id. at 1190. Ms. Car-rigan also testified at her deposition that Exeter Hospital only asked her to provide a call log for extension 4034, the purported extension of PA Hatch. Id. at 1191. She agreed that there were nineteen or twenty ED extensions, and that ED providers are commonly moving about the ED and could and did utilize whatever extension was most convenient. Id.
At the request of Attorney Kelley, Ms. Carrigan agreed to provide a call log report for all calls to any of the ED extensions on August 9, 2007. Id. at 1192. When Attorney Kelley followed up with Exeter Hospital’s attorney and requested the information Ms. Carrigan had agreed to provide prior to the end of trial, the hospital’s counsel advised Attorney Kelley that Ms. Carrigan had not yet returned from vacation, that he had no information regarding an additional search, that Ms. Carrigan was supposed to email him anything else she found, and that she had not sent him anything. Id. at 11193-95.
On November 30, 2012, after the post-verdict settlement, Exeter Hospital’s counsel emailed Attorney Kelley, advising that he had received an email from Ms. Carrigan on the afternoon the jury rendered a verdict (November 15, 2012). Id. at 1198. This email from Ms. Carrigan attached call logs for all the ED extensions and provided the explanation she had agreed to provide at the time of her deposition. Id. at 11199-200. She explained that the 1:12 p.m. and 1:25 p.m. calls from extension 6156 to the hospital operators (extensions 7009 and 7011) were not shown on the operator call logs because the hospital “did not have call splitting turned on in the Avaya switch. Whoever makes the call owns the record, so you cannot see the 6156 call when you view the logs for ext. 7011.” Id. at ¶200. In May 2014, Exeter Hospital informed the parties in this litigation that extension 4034 was not actually PA Hatch’s extension on August 9, 2007. Id. at ¶216.
DISCUSSION
I. Standard of Review
Summary judgment “make[s] possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715-16 (1991), and authorities cited. The familiar standard governing motions for summary judgment provides that summary judgment is to be granted where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(e); Barrows v. Wareham Fire Dist., 82 Mass.App.Ct. 623, 625 (2012), citing Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983). In assessing the record on a motion for summary judgment, all reasonable inferences are drawn in favor of the nonmoving party. Terra Nova Ins. Co. v. Fray-Witzer, 449 Mass. 406, 411 (2007). Moreover, in reviewing a summary judgment motion, the court does not “resolve issues of material fact, assess credibility or weigh evidence.” Kelly v. Brigham & Women's Hosp., 51 Mass.App.Ct. 297, 299 n.4 (2001). The moving party bears the burden of demonstrating the absence of evidence to support the nonmoving party’s claims. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 817 (1991).
*641 II. Analysis
A. Pre-Verdict Claims—Count I
Count I of the Complaint alleges that ProSelect was negligent in handling Dr. Johnson’s defense of the Jodoin case prior to the jury verdict. The negligence alleged in the Complaint includes: 1) failing to obtain “forensic investigation or discovery” regarding the Ex-eter Hospital telephone system records; 2) failing to obtain a “forensic analysis or other discovery” regarding records that the hospital is required to maintain under federal law;[3] 3) refusing to allow Dr. Johnson’s personal attorney to act as co-counsel in her defense; 4) refusing to utilize the services of an expert as to the availability of records documenting telephone calls from radiology to the ED; 5) failing to use at trial a chronology prepared by Dr. Johnson’s personal counsel; 6) failing to appreciate the potential exposure as the trial developed and to engage in settlement discussions; and 7) failing to conduct discoveiy or investigation as to the basis for the Jodoins dismissing the case as to the other defendants.
Proof of professional malpractice, in most instances, requires evidence in the form of expert testimony. Estate of Sicotte v. Lubin & Meyer, P.C., 157 N.H. 670, 674 (2008), citing Carbone v. Tierney, 151 N.H. 521, 527-28 (2004).[4] While “(e]xpert testimony is not required where the subject presented is within the realm of common knowledge and everyday experience,” it is required where the subject presented is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson.'[1] Id. at 673-74 (quotation omitted). “Absent exceptional circumstances, expert testimony is necessary to inform the jury regarding the skill and care ordinarily exercised by lawyers and to prove a breach thereof. Additionally, in most instances, expert testimony is also needed to prove causation. Unless the causal link is obvious or can be established by other evidence, expert testimony may be essential to prove what the lawyer should have done. Expert testimony on proximate cause is required in cases where determination of that issue is not one that lay people would ordinarily be competent to make.” Yager v. Clauson, 166 N.H. 570, 573 (2014) (quotations omitted). Massachusetts follows a comparable rule in legal malpractice cases. Frullo v. Landenberger, 61 Mass.App.Ct. 814 (2004); Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C., 25 Mass.App.Ct. 107 (1987).
Dr. Johnson’s claims that ProSelect was negligent in handling her defense in the Jodoin case prior to the jury verdict fail as a matter of law as she has not put forth the necessary expert testimony. Whether Dr. Johnson’s allegations of negligent defense are slyled as failures of Attorney Kelley for which ProSelect is allegedly liable or direct failures on the part of ProS-elect, the allegations raised are the iype that require expert testimony as to both the standard of care and causation. Yager, 166 N.H. at 573; Estate of Sicotte, 157 N.H. at 673-74. That evidence is lacking in this case.
In support of her claims, Dr. Johnson has submitted an expert disclosure authored by her personal counsel, Attorney Christopher Carter (“Attorney Carter”). Christopher Carter Expert Disclosure, attached to SUMF as Exhibit 72 (the “Expert Disclosure” or “Disclosure”). In the Disclosure, Attorney Carter appropriately explains that he is a fact witness as to events occurring after he was retained by Dr. Johnson. He then comprehensively chronicles his personal involvement and knowledge of ProSelect’s handling of the Jodoin case. Id. The Disclosure focuses primarily on ProSelect’s post-verdict conduct and the likelihood that a challenge to the verdict via post-trial motions and/or an appeal would have been successful (i.e., Counts II and III of the Complaint). Id.
While Attorney Carter does discuss some of the alleged deficiencies set forth in connection with Count I of the Complaint, he does not offer an opinion as to the standard of care required of ProSelect and/or Attorney Kelley with respect to those allegations. The closest the Disclosure comes to articulating a standard of care in connection with the alleged pre-trial failure to investigate is the following: “Proselect had not conducted an independent investigation to obtain information to show how the Exeter Hospital phone system functioned, to confirm that these calls were transferred to the ED, or to otherwise corroborate Dr. Johnson’s testimony that she called PA Hatch and recommended an MRI for Ms. Jodoin. Additionally, Proselect had not conducted an independent investigation to determine who, if anyone, reviewed Dr. Johnson’s Wet Read report, and when any such review occurred. Finally, other important factual issues had not been thoroughly investigated, including the circumstances surrounding the decision by [the Jodoins] to dismiss, with prejudice, and purportedly without any consideration, their claims against PA Hatch and Dr. Kelly.” Id. at p. 4.
Dr. Johnson’s Disclosure goes on to explain that at a meeting with Attorney Kelley and Dr. Johnson two weeks before trial, it became apparent to Attorney Carter that “Attorney Kelley would not have the time or ability to undertake a focused investigation of [these] issues” and that Attorney Carter subsequently expressed concern to ProSelect “that several issues that were critical to Dr. Johnson’s defense had not been sufficiently investigated . . .” Id. at pp. 4-5. The issues of concern to Attorney Carter included information about the Exeter Hospital call log and how the telephone system functioned, an audit trail that would have shown who opened the Wet Read Report and when (presumably to confirm Dr. Johnson’s testimony regarding her consultation with Dr. Marrero), and the dismissal of the ED defendants. Id. at p. 5.
While Attorney Carter explains what ProSelect and/or Attorney Kelley allegedly failed to investigate, *642 he does not articulate the standard of care or how ProSelect and/or Attorney Kelley breached that standard. Without such expert testimony Dr. Johnson cannot sustain her pre-verdict negligence claim against ProSelect.
Even if the Expert Disclosure had articulated a standard of care and how it was breached, the Disclosure would still be lacking in that it does not explain whether or how ProSelect’s and/or Attorney Kelley’s alleged deficiencies caused the adverse verdict. Instead the focus is on the likelihood of success of post-trial motions and/or an appeal, and ProSelect’s alleged bad faith conduct in settling the Jodoin case after the verdict. Id. at p. 1. Attorney Carter writes that “[i]t is more likely than not that a challenge to the verdict and judgment amount in the Jodoin case would have been successful,” but never conducts a similar causation analysis regarding the pre-verdict conduct of ProSelect and Attorney Kelley. Id. at p. 1.
Attorney Carter states: “[I]t was apparent to me that the case outcome turned on a discrete factual dispute: whether, on the afternoon of August 9, 2007, Dr. Johnson made two calls to PA Heidi Hatch in which she discussed Noel Jodoin’s CT scan and recommended a follow-up MRI. In other words, while the case involved claims of medical negligence, the outcome hinged on a credibility contest between Dr. Johnson, who contended she spoke at least twice with PA Hatch and recommended an MRI, and PA Heidi Hatch, who denied this occurred.” Id. at p. 2. Attorney Carter does not express the opinion that if ProSelect and/or Attorney Kelley had investigated the telephone records adequately, the outcome would have been different.
In discussing the grounds for appeal, Attorney Carter notes that the trial judge permitted the introduction of new call logs not disclosed until after the start of trial and allowed the testimony of Ms. Car-rigan, who was not identified as a witness until the fourth day of trial, over Attorney Kelley’s objections. Id. at p. 8. The Disclosure goes on to explain: “[Attorney Kelley] had no meaningful opportunity to evaluate or challenge the contents, reliability or completeness of the new logs and Ms. Carrigan’s testimony, or to understand the phone and data storage systems from which these logs were generated. The Jodoins’ attorney relied on this evidence to argue that Dr. Johnson had not been truthful when she testified that she called PA Hatch. Based on the trial judge’s record of his conference with the jurors, it is apparent that this evidence played a critical role in the jurors’ deliberations.” Id. at pp. 8-9. Attorney Carter does not allege that ProSelect’s and/or Attorney Kelley’s failure to investigate the telephone records, as opposed to the trial court’s decision to allow previously undisclosed information to be introduced as evidence at trial, without Dr. Johnson having an opportunity to evaluate or challenge that evidence, caused the adverse verdict. Without expert testimony linking the alleged pre-verdict deficiencies to the alleged harm, Dr. Johnson cannot sustain the negligence claim set forth in Count 1.
The various complex issues at play in the Jodoin case make the questions of standard of care and causation in this case “beyond the ken of the average layperson,” such that expert testimony is required to sustain a negligence claim based on pre-verdict conduct. Estate of Sicotte, 157 N.H. at 673 (quotation omitted). Since the expert testimony does not explain how the alleged pre-verdict conduct of ProSelect and/or Attorney Kelley either breached a standard of care or caused Dr. Johnson injury, Count I fails as a matter of law.
B. Post-Verdict Claims—Counts n & III
Count II of the Complaint alleges negligence after the verdict. In particular, Dr. Johnson alleges that ProSelect failed to pursue post-trial motions, and if necessary, an appeal, and that by settling the case after the verdict, ProSelect has caused Dr. Johnson “pecuniary and financial loss, mental and emotional distress, and significant and irreparable harm to her professional standing and reputation.” Count III of the Complaint alleges breach of contract, in particular, Dr. Johnson contends that ProSelect’s management of the defense and its refusal to pursue post-trial motions and an appeal before settling, was a breach of ProSelect’s duty to defend Dr. Johnson under the terms of the policy.
As to Counts II and III, ProSelect argues that under the terms of the malpractice insurance policy it had the right to settle the matter without Dr. Johnson’s consent after the jury verdict, and that there is no duty, implied or otherwise, to pursue post-trial remedies before settling the matter within the policy limits. In opposition to summary judgment, Dr. Johnson argues that ProSelect did not have an absolute right to settle after the verdict, where doing so was a breach of the duly of good faith that New Hampshire imposes on an insurer to its insured in defense of a third-party claim. Relying on Lawton v. Great Southwest Fire Ins. Co., 118 N.H. 607, 614 (1978), and other New Hampshire cases, Dr. Johnson argues that when defending a third-party claim, where there is the potential for injuring the insured by virtue of the insurer’s exclusive control over the defense of the case, the insurer has a duty to act in good faith. She contends that this includes an obligation to appeal where doing so is in the insured’s best interests.
Dr. Johnson’s post-verdict negligence claim against ProSelect (Count II) fails as a matter of law. While New Hampshire does recognize a cause of action in tort by an insured against an insurer regarding an alleged failure to settle, it has never recognized a cause of action under the circumstances presented here, i.e., where the insurer reached a settlement within policy limits, the insured did not face personal exposure, and *643 the applicable policy specifically allowed the insurer to settle after an adverse verdict without the consent of the insured. The cases of Bennett v. ITT Hartford Grp., Inc., 150 N.H. 753, 757-58 (2004); Lawton v. Great Southwest Fire Ins. Co., 118 N.H. 607, 613-14 (1978); Dumas v. State Farm Mut. Auto. Ins. Co., 111 N.H. 43, 47-48 (1971) (“Dumas 1”); and Dumas v. Hartford Accident & Indem. Co., 94 N.H. 484, 488-89 (1947), all recognize that an insurer owes an insured a duty of reasonable care in the handling and settlement of a third-party liability case in circumstances where an insurer’s conduct exposes the insured to personal liability. Dr. Johnson points to no New Hampshire case recognizing a duty to appeal or a cause of action in negligence against an insurer for settling a case within policy limits and refusing to pursue an appeal. This court declines to expand Dumas I and its progeny to include such a cause of action, particularly in light of New Hampshire’s recognition of a strong public policy favoring settlement of civil matters. Hogan Family Enters., Ltd. v. Rye, 157 N.H. 453, 456 (2008), citing Poland v. Twomey, 156 N.H. 412, 416 (2007).
Dr. Johnson’s breach of contract claim (Count III) also fails as a matter of law. This claim is based on her allegation that ProSelect breached the implied covenant of good faith and fair dealing by settling the underlying case against her wishes. While “there is ... implied in every contract an obligation of good faith and fair dealing,” Lawton, 118 N.H. at 612, New Hampshire courts “will not find a breach of the duty of good faith and fair dealing merely because a party has invoked a specific, limited right that is expressly granted by an enforceable contract.” Milford-Bennington R.R. Co. v. Pan Am Rys., Inc., No. 10-CV-00264-PB, 2011 WL 6300923, at *5 (D.N.H. Dec. 16, 2011), aff'd, 695 F.3d 175 (1st Cir. 2012). The implied covenant of good faith and fair dealing “does not abrogate the principle that ‘(p)arties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably.’ ” Id., quoting Mills v. Nashua Fed. Sav. & Loan Ass’n, 121 N.H. 722, 726 (1981); see Olbres v. Hampton Coop. Bank, 142 N.H. 227, 233 (1997) (party did not have to refrain from setting off bank account funds against loan balance where contract expressly granted that right without limitation); Centronics v. Genicom Corp., 132 N.H. 133, 144-45 (1989) (parly had no duly to approve early payment of uncontested portion of escrow funds where contract expressly governed timing of payment).
In this case, the insurance policy at issue specifically provides that ProSelect may settle claims “as [it] deems expedient” and without the consent of Dr. Johnson “[a]fter a juiy verdict, . . . regardless of whether such verdict, judgment or ruling is subject to
appeal or further judicial review.” SUMF §§20. 52. The fact that the policy included a provision requiring consent to settle before trial, but specifically states that ProSelect “shall not be obligated to obtain consent to settle . . . after a jury verdict,” demonstrates that the policy contemplated circumstances where the insurer and insured might disagree on settlement. By settling the underlying case within policy limits following the adverse verdict, ProSelect invoked a right expressly granted to it by the policy. This decision to invoke an express contractual right to settle cannot constitute a breach of the implied covenant of good faith and fair dealing. Milford-BenningtonR.R. Co., No. 10-CV-00264-PB, 2011 WL 6300923, at *5; Olbres, 142 N.H. at 233; Centronics, 132 N.H. at 144-45.
ORDER
Therefore, the defendant, ProSelect Insurance Company’s, Motion for Summary Judgment is ALLOWED.

 $2 million of coverage for Dr. Johnson, and $2 million coverage for ADI.

 Per Dr. Johnson’s trial testimony, a “Wet Read” is a way radiologists communicate to the ED an initial impression of a study. SUMF, ¶122.

 Dr. Johnson alleges that the Health Insurance Portability and Accountability Act (“HIPAA”) obligated Exeter Hospital to maintain an audit trail regarding access to the Jodoin head CT scan on August 9, 2007.

 In their respective memoranda, the parties agree that New Hampshire substantive law governs this dispute.